Donald H. CARLSON, Warren Hart, Gerald Haskins, Stephen R. Libby, Earl Weese, and Lyla C. Weese, Individually and as Class Representatives on Behalf of All Persons Similarly Situated, Appellants,

v.

STATE of Alaska, Commercial Fisheries Entry Commission, Appellee.

No. S–3290.

Supreme Court of Alaska.

Oct. 5, 1990.

Loren Domke, Domke and Olmstead, P.C., Juneau, for appellants.

Margot O. Knuth, Asst. Atty. Gen., and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This is a class action challenging Alaska's practice of charging nonresident commercial fishermen three times as much as resident fishermen for commercial licenses and limited entry permits. The class, consisting of "all persons who participated in one or more Alaska commercial fisheries at any time who paid non-resident assessments to the State for commercial or gear licenses or permits," alleges violations of two federal constitutional provisions: the Privileges and Immunities Clause,[1] and the Commerce Clause.[2] The class also challenges the charging of differential fees from June 22, 1978 until January 1, 1983 under former 20 Alaska Administrative Code (AAC) 05.220(a) as being without statutory authority. The class seeks declaratory and injunctive relief as well as a refund of excess payments under the current "unconstitutional" regime and the 1978–1982 "unconstitutional" and "unauthorized" regime. The superior court denied relief.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. STATUTORY HISTORY.

In 1949 the territorial legislature passed a law imposing a $50 commercial fishing license fee on nonresident fishermen and a $5 fee on residents, a 10:1 ratio. Ch. 66, § 2, SLA 1949. The law was struck down as violative of the Privileges and Immunities Clause of the Federal Constitution. *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952).

Beginning with statehood in 1959, the state charged differential licensing fees to resident and nonresident commercial fishermen pursuant to statute. Nonresident fishermen using most types of gear were charged three times the resident fee. *See* former AS 16.05.550, AS 16.05.570–.640; Ch. 94, art. III, § 8, SLA 1959. Exceptions to this rule existed for setnet or long line gear under former AS 16.05.560 (2:1 ratio) and for commercial operators of a single small boat under former AS 16.05.650 (no distinction).

The Limited Entry Act became effective April 27, 1973. Ch. 79, SLA 1973, *codified in* Alaska Statutes, Title 16, Article 43.

Alaska Statute 16.43.010(a) described the purpose of the Limited Entry Act as follows:

> It is the purpose of this chapter to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination.

Alaska Statute 16.43.100(a)(6) provided that the Commercial Fisheries Entry Commission (CFEC) "shall ... establish qualifications for the issuance of entry permits...." AS 16.43.100(b) provided that the CFEC "may do all things necessary to the exercise of its powers under this chapter, whether or not specifically designated

---

1. The Privileges and Immunities Clause provides:
   The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.
   U.S. Const. art. IV, § 2, cl. 1.

2. The Commerce Clause provides:
   The Congress shall have the power ... to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes....
   U.S. Const. art. I, § 8, cl. 3.

in this chapter." AS 16.43.110 provided· that the CFEC "may adopt regulations, consistent with law, necessary or proper in the exercise of its powers or for the performance of its duties under this chapter."

Alaska Statute 16.43.160 was first enacted in 1973. Ch. 79, SLA 1973. Former AS 16.43.160 provided in part:

(a) The [CFEC] shall establish annual fees for the issuance and annual renewal of entry permits or interim use permits to reflect the cost of administering this chapter. Fees collected under this section shall be paid into the general fund.

(b) Annual fees established under this section shall be no less than $10 and no more than $100 and shall reasonably reflect the different rates of economic return for different fisheries.

Between 1973 and 1978, commercial fishermen were thus required to pay for both a gear license and a limited entry permit. While gear license fees for nonresident commercial fishermen were thrice, in most instances, what they were for residents initially, entry permit fees did not distinguish between residents and nonresidents. *See* former 20 AAC 05.220 (1974).

During the 1977 legislative session, the legislature revised the commercial fishing licensing scheme. Ch. 105, SLA 1977. Gear licenses were abolished altogether. Ch. 105, § 19, SLA 1977. Alaska Statute 16.43.160(a) was amended by removing the phrase "to reflect the cost of administering this chapter." Thus, AS 16.43.160(a) then read in part: "The [CFEC] shall establish annual fees for the issuance and annual renewal of entry permits or interim use permits." Additionally, AS 16.43.160(b) was amended to increase the maximum amount the CFEC could charge for a license from $100 to $750. Ch. 105, § 15, SLA 1977. These changes became effective January 1, 1978. Ch. 105, § 20, SLA 1977.

On the effective date of these changes, the CFEC could no longer charge differential gear license fees, or for that matter any gear license fees. On this same date, the CFEC amended 20 AAC 05.220 to provide for a 3:1 nonresident fee differential for entry permits. *See* Ch. 105, § 20, SLA 1977; former 20 AAC 05.220.

It was the view of then Attorney General Avrum Gross, as demonstrated by a letter from him to then Governor Jay Hammond, that "the fees now collected for [gear] licenses would be incorporated administratively by the [CFEC] into the fee for a permit as would the 3–1 nonresident-resident fee differential." Moreover, the increase in the maximum chargeable entry fee (from $100 to $750) was believed by Attorney General Gross, as shown by another letter to Governor Hammond, to "allow entry permit fees to incorporate the license fees which would be eliminated." The letters also show that he anticipated the enactment of regulations to accomplish this incorporation.

In 1981, an informal opinion of the attorney general was issued concerning whether the 3:1 fee ratio of 20 AAC 05.240(a) was authorized by statute, following a request by the chairman of the CFEC. 1981 Informal Op. Att'y Gen. 984. Without citing any directly supportive authority, the author concluded the differential was not authorized. *Id.* The regulations attorney for the CFEC disagreed with this assessment.

In 1982, the legislature again amended AS 16.43.160(b). This section now reads:

(b) Annual fees established under this section shall be no less than $10 and no more than $750 and shall reasonably reflect the different rates of economic return for different fisheries. The amount of an annual fee for a nonresident shall be three times the amount of the annual fee for a resident.

The 1982 amendment thereby gave more certain authority to the CFEC to charge a 3:1 fee differential. This amendment was effective January 1, 1983. Ch. 79, § 3, SLA 1982.

## B. HISTORY OF STATE EXPENDITURES AND REVENUES.

The record contains a lengthy and detailed analysis of the revenues and expenditures connected with·fisheries management for fiscal years 1978–1984.

The state contended below that the 3:1 fee ratio partially reimburses the state for that portion of the costs of fisheries management, enforcement and conservation attributable to nonresidents. The state, in essence, argued that it is subsidizing all commercial fishermen by not charging any of them (resident or not) his share of the costs of fisheries management.

The state's analysis identified four sources as the aggregate cost of fisheries management. First, the state included the annual operating budget of the CFEC itself (cost of issuing licenses and permits, etc.). These amounts are evidenced by state budget reports for each year in question.

Second, the state included 40.6% of the annual operating budget of the Department of Public Safety (DOPS), representing the amount spent by state law enforcement agencies in support of commercial fisheries enforcement. The amount of the DOPS operating budget is also evidenced by state budget summaries for each year.

Third, the state included the annual operating budget of the Division of Commercial Fisheries, a division of the Department of Fish and Game. This division determines "how many fish are available each year for commercial harvesting." These expenditures are also voluminously documented by budget reports. Not counted as expenditures were "[a]dministration and [s]upport costs."

The state also included the annual operating budget of the Fisheries Rehabilitation Enhancement and Development (FRED) Division of the Department of Fish and Game. FRED

rehabilitates and enhances fisheries by determining where and when fish are needed or wanted to be, and then producing the fish at that time and place. This is done by conducting extensive research studies and then working on the variety of projects that will implement the plans decided upon, which include establishing and running fish hatcheries, fertilizing

lakes, planting fish, and cleaning up streams used by androgenous fish.

FRED's expenditures are also documented by budget breakdowns for each year. Not counted in FRED's expenditures were "[a]dministration and [s]upport costs" and sport fishing expenditures.

The state then attributed to nonresidents a percentage of these costs equal to the percentage of entry permits held by nonresidents in each year.[3]

Finally, the state presented evidence of revenues collected in connection with commercial fishing. The state included two sources: commercial entry permit fees and commercial fishing license fees. These numbers are again documented by budget reports.

The state then compared the percentage of expenditures attributable to nonresidents with the percentage of revenues taken in from nonresidents. In each year nonresident revenues from the sources counted falls considerably short of nonresident expenditures. *See* Appendix.

The class does not seriously dispute the factual accuracy of the foregoing figures. The amounts cited by both litigants as to expenditures suffer from only minor, immaterial discrepancies. Rather, the class disputed the inclusion of certain costs and the exclusion of certain revenues in the analysis. First, the class contended that the proper framework for examining whether nonresidents were contributing their share to fisheries management would be to contrast CFEC revenues with only CFEC expenditures, i.e. "expenses directly traceable to the costs of issuing permits and licenses." Including only these expenditures, the 3:1 fee ratio scheme results in a net profit to the state.

Alternatively, the class contended that if inclusion of all fisheries management expenditures in the analysis was appropriate, then "all sources of revenue [to the state] attributable to [nonresident] commercial fishermen" should also be included. The class urged the inclusion of "revenues de-

---

**3.** The evidence of record shows that this percentage of costs actually favors nonresidents, who catch more fish per capita and hence de-

rive more benefit from maintenance expenditures.

rived indirectly from commercial fishermen from tax shifting by the fish processing industry, federal funds, marine fuel taxes, corporate and individual income taxes, and other sources of revenue derived from commercial fishermen." Including these indirect revenues, only in fiscal years 1983 and 1984 did expenditures exceed revenues.

## C. PROCEDURAL BACKGROUND.

On its first motion for summary judgment, the state prevailed on some issues, with the court finding material questions of fact remaining on others. On the Privileges and Immunities issue, the superior court held, relying on *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460, *reh'g denied,* 335 U.S. 837, 69 S.Ct. 12, 93 L.Ed. 389 (1948), that while the issuance of licenses to fish commercially was sufficiently important to implicate the Privileges and Immunities Clause, the state had demonstrated a "permissible" reason for the discrimination. This reason was "to have the non-resident[s] pay a part of their fair share of the costs of enforcement, management and conservation of the fisheries of this state, which costs are largely borne by the residents through general fund expenditures." The superior court decided that an analysis of whether this purpose was being met by the 3:1 fee ratio required comparison of all revenues collected directly from commercial fishers, with all the expenditures by the State on maintaining, conserving, or managing the fishery. It rejected the class' two proposed methods of determining fair share contribution: 1) comparing CFEC revenues with CFEC expenditures and 2) comparing all revenues from all sources (including corporate taxes, business license taxes, fuel taxes, etc.) garnered from nonresident commercial fishers with all expenditures to maintain fisheries.

The superior court found that the state had presented evidence "of the operating budgets of the four entities of the State which are concerned with enforcement, operation, management, and conservation of the fisheries. The State's evidence indicates further that the operating budgets of

these entities exceeded, in the years 1979 through 1984, the amount they collected in resident and non-resident licensing. ..." Nevertheless, the superior court also found that there was a material question of fact as to whether the operating budgets truly reflected the costs of fisheries management.

As to the Commerce Clause challenge, the court held that commercial fishing in this state is within the reach of the Clause. It also held that the fee differential discriminated against interstate commerce on its face. However, the court reasoned that the same "legitimate local purpose" (ensuring that nonresidents pay their fair share of management costs) justified the discrimination, assuming the fee differential bore a substantial relationship to the purpose. Again, the court found the same question of material fact: whether the state's figures truly reflected the costs of management. The court also held that there is no less restrictive way to ensure that nonresidents pay their fair share of the costs of fisheries management than to collect the money from them as a fee.

The superior court further held that the CFEC had implied authority to enact 20 AAC 05.220(a) and charge a 3:1 fee differential before 1983. The court offered several factors supporting its conclusion. First, it noted that the 3:1 entry fees were enacted concurrent with the abolition of 3:1 gear license fees. The court reasoned that the 1977 amendments, as reflected by the attorney general's letters, were intended to substitute differential entry permit fees for differential gear fees. The court also noted that the Limited Entry Act did not forbid fee ratios. The court added that AS 16.43.160(a) did not merely authorize the issuance of licenses, but instead directed the CFEC to "establish annual fees for the issuance and annual renewal of entry permits or interim use permits." Finally, the court reasoned that the deletion of the requirement that permit fees "reflect the cost of administering this chapter" from AS 16.43.160(a), along with the increase in maximum chargeable license fees, were indicative of intent to allow the CFEC to

recoup to the General Fund whatever monies were expended for the management of fisheries.

Finally, the superior court held that even should the class eventually prevail, its members would not be entitled to a refund of fees extracted under an unconstitutional or unauthorized statute.

Later, the superior court reconsidered its decision that there were questions of material fact concerning whether the figures submitted by the state sufficed. Based on the state's more expansive documentation of costs and expenditures (discussed in section I B, *supra*), the court held that no question of material fact remained regarding the accuracy of the state's calculations.

The class appeals.

## II. DISCUSSION

### A. SUMMARY JUDGMENT WAS IMPROPERLY GRANTED AS TO THE CLASS' PRIVILEGES AND IMMUNITIES AND COMMERCE CLAUSE CHALLENGES.

The Privileges and Immunities Clause of article IV, section 2 of the United States Constitution provides: "[t]he citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

> The primary purpose of this clause ... was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.... In line with this underlying purpose, it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.

*Toomer v. Witsell*, 334 U.S. 385, 395–96, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460, *reh'g denied*, 335 U.S. 837, 69 S.Ct. 12, 93 L.Ed. 389 (1948) (footnote omitted).

■■■ Less favorable treatment by the state towards nonresidents runs afoul of the Privileges and Immunities Clause if: 1) the activity in question is " 'sufficiently basic to the livelihood of the Nation' ... as to fall within the purview of the [clause]," *and* 2) "[it] is not closely related to the advancement of a substantial state interest." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64–65, 108 S.Ct. 2260, 2264, 101 L.Ed.2d 56 (1988) (citations omitted). *See also Toomer*, 334 U.S. at 396, 68 S.Ct. at 1162; *Robison v. Francis*, 713 P.2d 259, 263–64 (Alaska 1986). In determining whether the discrimination bears a close relationship to the permissible purpose, the availability of less restrictive means is relevant. *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 284, 105 S.Ct. 1272, 1278, 84 L.Ed.2d 205 (1985); *Robison*, 713 P.2d at 264.

■■■ Commercial fishing is a sufficiently important activity to come within the purview of the Privileges and Immunities Clause, and license fees which discriminate against nonresidents are *prima facie* a violation of it. *See Toomer*, 334 U.S. at 397, 68 S.Ct. at 1162; *Mullaney v. Anderson*, 342 U.S. 415, 417–18, 72 S.Ct. 428, 429–30, 96 L.Ed. 458 (1952). *Compare Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 388, 98 S.Ct. 1852, 1862, 56 L.Ed.2d 354 (1978) (sport or recreational hunting not protected by Privileges and Immunities Clause). Thus the questions here are whether the state has a substantial reason for the discrimination, and whether the 3:1 fee ratio bears a sufficiently close relationship to the goal. The class argues both that there is no "substantial reason" for the discrimination, and that even if there is, the fee differential is not "closely related" to furthering the purpose.

In *Toomer*, South Carolina sought to justify a 100:1 ratio by arguing that its "conservation program for [fisheries] requires expenditure of funds beyond those collected in license fees—funds to which residents and not non-residents contribute." *Toomer*, 334 U.S. at 398, 68 S.Ct. at 1163. The Court held that it was permissible *"to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expendi-*

*tures from taxes which only residents pay.*" *Id.* at 399, 68 S.Ct. at 1163 (emphasis added). However, the Court also held that South Carolina had not established a relationship between the justification and the differential fee. "Nothing in the record indicates that non-residents use larger boats or different fishing methods than residents, that the cost of enforcing the laws against them is appreciably greater, *or that any substantial amount of the State's general funds is devoted to [fisheries] conservation.*" *Id.* at 398, 68 S.Ct. at 1163 (emphasis added).

*Mullaney* dealt with Alaska's territorial predecessor to the differential fee scheme at issue here. The territorial scheme imposed a $5 license fee on resident commercial fishermen, and a $50 fee on nonresidents, a 10:1 ratio. Ch. 66, § 2, SLA 1949; *see also Mullaney*, 342 U.S. at 416, 72 S.Ct. at 429. In *Mullaney*, Alaska, as did South Carolina in *Toomer*, asserted that the discriminatory fee was justified by a substantial reason; to wit, "the higher cost of enforcing the license law against nonresident fishermen." *Id.* at 417–18, 72 S.Ct. at 430.

The *Mullaney* Court reiterated its suggestion in *Toomer* that this would be a sufficient reason to impose a discriminatory fee, but again held that there was "nothing to indicate that [the fee differential] 'would merely compensate' for the added enforcement burden." *Id.* at 418, 72 S.Ct. at 430. According to the *Mullaney* Court, "[c]onstitutional issues affecting taxation do not turn on even approximate mathematical determinations. But something more is required than a bald assertion to establish a reasonable relation between the higher fees and the higher cost to [Alaska]." *Id.*

Subsequent to *Mullaney*, non-fisheries cases have resounded the "more than a bald assertion" theme. In *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975) the Court found

no support in the record for the assertion of the court below that the [tax] creates no more than a "practical equality" between residents and nonresidents when

the taxes paid only by residents are taken into account. "[S]omething more is required than bald assertion—by the state court or by counsel here—to establish the validity of a taxing statute that on its face discriminates against nonresidents."

*Id.* at 666 n. 10, 95 S.Ct. at 1197 n. 10 (citation omitted).

In *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), Alaska's local hire law failed Privileges and Immunities scrutiny for this same reason.

[A]lthough the statute may not violate the [Privileges and Immunities] Clause if the State shows "something to indicate that non-citizens constitute a peculiar source of evil at which the statute is aimed," ... and, beyond this, the State "has no burden to prove that its laws are not violative of the ... Clause," ... certainly no showing was made on this record that nonresidents were "a peculiar source of the evil" Alaska Hire was enacted to remedy, namely, Alaska's "uniquely high unemployment." ... What evidence the record does contain indicates that the major cause of Alaska's high unemployment was not the influx of nonresidents seeking employment, but rather the fact that a substantial number of Alaska's jobless residents—especially the unemployed Eskimo and Indian residents—were unable to secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities; and that the employment of nonresidents threatened to deny jobs to Alaska residents only to the extent that jobs for which untrained residents were being prepared might be filled by nonresidents before the residents' training was completed.

*Id.* at 526–27, 98 S.Ct. at 2488 (citations and footnote omitted).

How much record support is needed under these cases to demonstrate a sufficiently "close connection" to a legitimate state purpose remains unclear. One court has noted:

[T]here is a certain ambiguity in the Supreme Court cases concerning the burden of going forward with the evidence and the burden of persuasion of the challenger and the state.... Justice Brennan dissenting in *Baldwin* discussed the burdens on the challenger and the state in a privileges and immunities case as follows: "Although a State has no burden to prove that its laws are not violative of the Privileges and Immunities Clause, its mere assertion that the discrimination practiced against nonresidents is justified by the peculiar problem nonresidents present will not prevail in the face of a prima facie showing that the discrimination is not supportable on the asserted ground."

Justice Brennan, writing for the Court in *Hicklin*, discussed the burdens in a privileges and immunities case in the following language: "For although the statute may not violate the Clause if the State shows 'something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed,' and, beyond this, the State 'has no burden to prove that its laws are not violative of the ... Clause,' certainly no showing was made on this record that non-residents were 'a peculiar source of the evil [the statute] was enacted to remedy....' "

Professor Tribe comments on the burden of proof in a privileges and immunities case as follows: "The standard of review employed in *Toomer* ... characterized by a shift in the burden of proof to the discriminating state and by an insistence on a fairly precise fit between remedy and classification, is almost as demanding as that elaborated by the Warren Court in equal protection and first amendment strict scrutiny."

Another commentator ... described the burden of proof rule established in *Hicklin* as follows: "[Justice Brennan in *Hicklin*] departed from the traditional allocation of the burden of proof in cases arising under the clause. Before *Hick-*

*lin,* the nonresident had the burden of disproving the validity of the justifications offered by the state. *Hicklin* places a duty on the state to demonstrate a relationship between the presence of nonresidents and the problem which the state purports to alleviate. The shift of the burden of proof in this first prong discards the presumption of constitutionality that a statute normally enjoys and is inconsistent with Justice Brennan's position in *Baldwin* that the state had this burden only after the nonresident had made a 'prima facie showing that the discrimination is not supportable on the asserted grounds.' While Justice Brennan offered no explanation for this shift, it is consistent with his concern for the individual's interest.

Although the United States Supreme Court cases are not clear, we conclude that the challengers of the statutes in the case at bar bear the burden of producing evidence demonstrating the discriminatory effect of the statute on nonresidents. If a discriminatory effect is shown, the state has the burden of producing 'something to indicate that nonresidents constitute a peculiar source of evil at which the statute is aimed' ... if the state makes such a showing, the challengers have the burden of showing the discrimination is "not supportable on the asserted grounds."

*Taylor v. Conta,* 106 Wis.2d 321, 316 N.W.2d 814, 823 n. 17 (1982) (citations omitted). *Contra, Silver v. Garcia,* 592 F.Supp. 495, 498 (D.P.R.1984); *Glenovich v. Noerenberg,* 346 F.Supp. 1286, 1293 (D.Alaska), *aff'd,* 409 U.S. 1070, 93 S.Ct. 687, 34 L.Ed.2d 660 (1972) (state bears the burden of justification). We are persuaded by the Wisconsin Supreme Court's analysis, and agree with its conclusion that the burden of persuasion to demonstrate justification is properly placed on the state.

The analysis under Article I, section 8, clause 3 of the United States Constitution (the Commerce Clause) is quite similar, assuming that it is implicated.[4] The Com-

---

**4.** Early cases suggested that the Commerce Clause does not come into play until the fish are

actually harvested, *e.g., McCready v. Virginia,* 94 U.S. 391, 396, 24 L.Ed. 248 (1876); *Toomer,* 334

merce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." "Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade." *Maine v. Taylor,* 477 U.S. 131, 137, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (*quoting Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980)). "[O]nce a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Taylor,* 477 U.S. at 138, 106 S.Ct. at 2447, *quoting Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736.[5]

The superior court, in granting summary judgment in favor of the state, adopted the reasoning of *Salorio v. Glaser,* 82 N.J. 482, 414 A.2d 943, *cert. denied,* 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 94, *app. dism.,* 449 U.S. 804, 101 S.Ct. 49, 66 L.Ed.2d 7 (1980). In *Salorio,* New Jersey sought to impose an "Emergency Transportation Tax" (ETT) on nonresidents who used the state highway system. *Salorio,* 414 A.2d at 945. The *Salorio* court interpreted *Toomer* and *Mullaney* to permit a state to "impose upon nonresidents the additional expenses occasioned by their activities within the state, or the reasonable costs of benefits which they receive from the state." *Salorio,* 414 A.2d at 953. "[T]he State may exact from [nonresidents] a fair share of the cost of adequate transportation facilities without violating the Privileges and Immunities Clause." *Id.* 414 A.2d at 954.

U.S. at 394–95, 68 S.Ct. at 1161–62 (Commerce Clause not implicated by a nondiscriminatory tax where taxable event, the taking of shrimp, "occurs before the shrimp can be said to have entered the flow of interstate commerce."); *Alaska v. Arctic Maid,* 366 U.S. 199, 203, 81 S.Ct. 929, 932, 6 L.Ed.2d 227 (1961) (actual taking of fish is a "local activity" outside the Commerce Clause, despite the fact that the fish are destined for interstate commerce). *See also Tangier Sound Watermen's Ass'n v. Douglas,* 541 F.Supp. 1287, 1301–06 (E.D.Va.1982) (review of the cases); *State v. Reefer King Co., Inc.,* 559 P.2d 56, 64 (Alaska 1976), *modified on reh'g,* 562 P.2d 702 (Alaska 1977) (taxes distinguishing between floating and shorebased processors do not implicate Commerce Clause where statute excludes interstate movement of "floaters" from taxation).

Dictum in more recent cases, however, suggests the contrary.

[While] at earlier times in our history there was some doubt whether Congress had power under the Commerce Clause to regulate the taking of fish in state waters, there can be no question today that such power exists where there is some effect on interstate commerce. The movement of vessels from one State to another in search of fish, and back again to processing plants, is certainly activity which Congress could conclude affects interstate commerce.

*Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 281–82, 97 S.Ct. 1740, 1750, 52 L.Ed.2d 304 (1977) (citations and footnote omitted).

*Hicklin* also suggests that the Commerce Clause applies to this case. "[T]he Commerce

Clause circumscribes a State's ability to prefer its own citizens in the utilization of natural resources found within its borders, *but destined for interstate commerce." Hicklin,* 437 U.S. at 533, 98 S.Ct. at 2491 (emphasis added).

The Court has also held that state laws which ban the export from the state of fish taken instate, and state laws which ban the import of fish taken out of state, at least implicate the Commerce Clause. *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (export, struck down); *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (import, upheld). Despite its broad dictum in *Douglas,* the court in *Hughes* quoted with approval from Justice Field's dissent in *Geer v. Connecticut,* 161 U.S. 519, 538, 16 S.Ct. 600, 608, 40 L.Ed. 793 (1896) (Field, J., dissenting): "[w]hen any animal ... is lawfully killed for purposes of food or other uses of man, it becomes an article of commerce, and its use cannot be limited to the citizens of one State to the exclusion of citizens of another State." *Hughes,* 441 U.S. at 329, 99 S.Ct. at 1732.

5. *Taylor* seems to squarely put the burden of justification on the state, whereas Privileges and Immunities Clause cases (as discussed *supra* ) have been inconsistent on this issue. It would be anomalous, however, to conclude that a law facially discriminating against interstate commerce could pass muster under the Privileges and Immunities Clause yet fail under the Commerce Clause; both clauses have a common origin in the fourth article of the Articles of Confederation. *Baldwin,* 436 U.S. at 379, 98 S.Ct. at 1858.

We believe that the superior court erred in adopting *Salorio*. In our view, its focus is misplaced. Implicit in *Salorio* is the notion that it is permissible to require non-residents to pay up to 100% of their *pro rata* share of expenditures regardless of what percentage of their *pro rata* share residents are in fact paying. In other words, *Salorio*, as applied to this case, seems to add up to a general proposition that the state may subsidize its own residents in the pursuit of their business activities and not similarly situated nonresidents, even though this results in substantial inequality of treatment. Such a principle seems economically indistinguishable from imposing a facially equal tax on residents and nonresidents while making it effectively unequal by a system of credits and exemptions. Such schemes have been struck down by the United States Supreme Court. *Austin, supra; Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920). *See also Williams v. Zobel*, 619 P.2d 422, 429–30 & 436–37 (Alaska 1980) (Rabinowitz, C.J., concurring).

The proper focus in our view is on whether residents and similarly situated nonresidents are being treated with substantial equality. The appropriate inquiry is thus whether all fees and taxes which must be paid to the state by a nonresident to enjoy the state-provided benefit are substantially equal to those which must be paid by similarly situated residents when the residents' *pro rata* shares of state revenues to which nonresidents make no contribution are taken into account.

The language of *Toomer* to the effect that it would be permissible "to charge nonresidents a differential which would merely compensate the state ... for any conservation expenditures from taxes which only residents pay" requires additional discussion. We read this statement to mean that if nonresident fishermen paid the same taxes as Alaskans and these taxes were substantially the sole revenue source for the state out of which conservation expenditures were made, then differential fees would not be permissible. That, however, is not the case in Alaska where a very high proportion of total state reve-

nues are derived from petroleum production. For example, in fiscal year 1986, 86 percent of state revenues were so derived. *Trustees for Alaska v. State*, 795 P.2d 805–810 (Alaska 1990). Thus, in 1986, it would be correct to say that eighty-six cents of each dollar spent for conservation came from state revenue sources to which non-resident fishermen made no contribution. These revenues could have been used to benefit residents through various other programs and they are, analytically, equivalent to "taxes which only residents pay."

The point of *Toomer*, thus, is that the state may equalize the economic burden of fisheries management; where residents pay proportionately more by way of foregone benefits than nonresidents for fisheries management, nonresidents may be charged higher fees to make up the difference. On this record we are unable to determine whether the higher fees charged nonresidents are excessive for this purpose. Thus, we are unable to say whether there is "a fairly precise fit between remedy and classificaiton." *Taylor v. Conta*, 316 N.W.2d at 823 n. 17. The burden is on the state to make this showing.

We reverse the superior court's determination of this issue and remand for further proceedings consistent with this opinion.

B. THE 3:1 FEE DIFFERENTIAL WAS AUTHORIZED BY STATUTE PRIOR TO THE EFFECTIVE DATE OF THE 1982 AMENDMENTS TO AS 16.43.-160(b) (1/1/83).

■ We now address the class' contention that the 3:1 fee ratio was not authorized by statute prior to 1983. Alaska Statute 16.43.110(a), beginning in 1973 and continuing to the present day, provides that the CFEC "may adopt regulations, consistent with law, necessary or proper in the exercise of its powers or for the performance of its duties under this chapter." Ch. 79, § 1, SLA 1973. Former AS 16.43.160(a) mandated that "[t]he [CFEC] *shall* establish annual fees for the issuance and annual renewal of entry permits or interim use permits." (Emphasis added). The language limiting the CFEC's fees to "reflect

the cost of administering this chapter" was removed by the 1977 amendments, along with an increase in the maximum fee from $100 to $750 and abolishment of gear licenses. Ch. 105, § 15, SLA 1977.

The analysis of this issue is governed by *Johns v. Commercial Fisheries Entry Commission*, 758 P.2d 1256 (Alaska 1988). Examining the validity of CFEC regulations is a three step process: we determine " 'whether the legislature delegated rulemaking authority to the [CFEC], whether the [CFEC] followed the Administrative Procedure Act in promulgating this regulation, and whether the regulation is consistent with and reasonably necessary to implement the statutes authorizing its adoption.' " *Johns*, 758 P.2d at 1260, *quoting Chevron USA Inc. v. LeResche*, 663 P.2d 923, 927 (Alaska 1983). No one contends that the differential fee structure was not promulgated in accordance with the APA.

This court recognized in *Johns* that AS 16.43.110(a) is a broad delegation of power to the CFEC to adopt regulations "necessary or proper" to implement the purposes of the Act. *Johns*, 758 P.2d at 1256; *see also Kalmakoff v. State, Commercial Fisheries Entry Comm'n*, 693 P.2d 844, 853 (Alaska 1985). The purpose of the Limited Entry Act is "to promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry into the commercial fisheries in the public interest and without unjust discrimination." AS 16.43.010(a). Thus, if the 3:1 ratio regulation was a necessary or proper implementation of these purposes, it was authorized.

We conclude that this regulation was a proper implementation of the purposes of the Act. Conservation and sustained yield management are not free. What evidence of legislative intent there is from the 1977 amendments to the Act shows that Limited Entry Act fees were intended to substitute for the previous differential gear license fees as the means of ensuring nonresident contribution toward the cost. The maximum amount chargeable was raised from $100 to $750. Ch. 105, § 15, SLA 1977. The clause seemingly limiting the level of fee collection to CFEC expenditures alone was abolished. Ch. 105, § 15, SLA 1977. The executive branch also apparently believed that was the purpose of the amendment. We therefore reject the class' contention.[6]

## C. IS THE CLASS ENTITLED TO A REFUND SHOULD THEY PREVAIL ON REMAND?

The class also appeals the superior court's ruling that its members would not be entitled to a refund should they prevail on their constitutional claims. Since we are remanding the superior court's determination of the constitutional issues, we will address the issue of refund availability.

Alaska Statute 43.15.010(a) provides:

The Department of Administration shall, with the approval of the attorney general and the Department of Revenue, refund to a taxpayer the amount of a tax paid to the Department of Revenue under protest and deposited in the treasury if (1) the taxpayer recovers judgment against the Department of Revenue for the return of the tax, or (2) in the ab-

---

**6.** The class appears to argue that AS 16.43.160(a) is a dedication of state taxes or licenses to a special purpose in contravention of Article IX, § 7 and an improper delegation of taxing power under Article X, § 2 of the Alaska Constitution.

The "special dedication" argument is frivolous. On the face of AS 16.43.160(a), all funds collected from license fees are paid directly into the general fund. *Compare State v. Alex*, 646 P.2d 203, 207–11 (1982) ("earmarked" funds).

The Article X, § 2 argument is equally meritless. The class argues that if we construe AS 16.43.160(a) to authorize the collection of fees

by the CFEC in an amount greater than is necessary to fund the CFEC's issuance of licenses, this would give rise to an unconstitutional delegation of taxing power. Article X, § 2 simply has nothing to do with this case. It provides that "[a]ll local government powers shall be vested in cities and boroughs. The State may delegate taxing powers to organized cities and boroughs only." This is a limitation intended to simplify the structure of local government; nothing in this suggests any limitation on the state's ability to create a *state* agency and authorize it to set license levels. *Compare Alex*, 646 P.2d at 211–13.

sence of a judgment, it is obvious to the Department of Revenue that the taxpayer would obtain judgment if legal proceedings were prosecuted by the taxpayer.

We recently considered the scope and effect of this statute in *Principal Mutual Life Ins. Co. v. State, Division of Insurance,* 780 P.2d 1023 (Alaska 1989). Although we declined to definitively resolve the question of whether AS 43.15.010(a) foreclosed a common law action in assumpsit for taxes wrongfully assessed and paid, we clearly held that both under the statute and common law, the taxpayer must formally "protest the payment of the tax at the time of payment in order to subsequently maintain" either a common law or statutory cause of action. *Principal Mutual,* 780 P.2d at 1028–30.

In *Pacific American Fisheries, Inc. v. Mullaney,* 13 Alaska 729, 105 F.Supp. 907, 909 (1952), the district court considered whether the excess fishing license fees collected under Alaska's previous 10:1 fee scheme, struck down in *Mullaney v. Anderson,* could be refunded under § 48–7–1, ACLA 1949, recodified into the current tax refund statute as AS 43.15.010. *See Principal Mutual,* 780 P.2d at 1028 n. 17. The district court held that the differential gear license fee was a tax within the meaning of the refund statute. *Pacific American Fisheries,* 105 F.Supp. at 908–09. The holding of *Pacific American Fisheries* finds continued support in the title of AS 43.15, "Refunds of Taxes and Licenses." *See also* AS 43.15.010(c) (providing for the refund of "license taxes" where a licensee is "prevented from using

the license by court order....") Thus, in the abstract, the class might avail itself of this statute to recover any unconstitutionally extracted fees.

However, the class seems to concede in its brief that the necessary protests were not made, instead presenting argument that the requirement of a protest was waived. The protest requirement may be waived by the taxing authority. *Principal Mutual,* 780 P.2d at 1029. On remand, the court should conduct appropriate inquiry into this issue.

We also note that the superior court has been operating under the assumption that a six-year statute of limitations applies to the class' sought after refund. However, there is a specific statute of limitations applicable to claims for tax refunds. Alaska Statute 43.05.275 provides that:

> a claim for credit or *refund of a tax under this title for which a taxpayer is required to* file a return or *pay a tax may be filed by the taxpayer* (1) before the later of (A) three years from the time the return was filed; or (B) two years from the time the tax was paid; or (2) *within two years from the time the tax was paid, if no return was filed.*

(Emphasis added). On remand, assuming that the class overcomes the hurdle of failing to protest payment, it is limited by this two year statute of limitations.

## III. CONCLUSION

The judgment of the superior court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

## APPENDIX

### PERCENTAGE OF COSTS PAID BY NONRESIDENTS
### COMPARED TO PERCENTAGE ATTRIBUTABLE TO NONRESIDENTS

| Year | Total No. of Permits | Number of Permits Held by Non–Res. | % Held | Total Costs of Enforcement & Conservation (in Thous.) | Fair Share of Non–Res. (Total Costs × %) (in. Thous.) | Amount Paid by Non–Res. (in Thous.) | % Paid |
|---|---|---|---|---|---|---|---|
| 1979: | 26,716 | 4,884 | 18% | 18,151.7 | 3,267.3 | 1,492.2 | 8.22% |
| 1980: | 29,432 | 5,548 | 19% | 17,901.2 | 3,401.2 | 1.240.4 | 6.93% |
| 1981: | 28,312 | 5,039 | 18% | 23,316.1 | 4,196.9 | 1,465.1 | 6.28% |
| 1982: | 29.021 | 5,181 | 18% | 28,986.5 | 5,217.6 | 1,397.8 | 4.82% |
| 1983: | 24,450 | 4,608 | 19% | 30,999.0 | 5,889.8 | 1,335.6 | 4.31% |
| 1984: | 29,322 | 4,718 | 16% | 34,023.2 | 5,443.7 | 1,381.3 | 4.06% |