M. SMITH, Circuit Judge,
with whom HURWITZ and OWENS, Circuit Judges, join in full, and REINHARDT and BERZON, Circuit Judges, join as to Part III, dissenting:
The majority assumes 'away the major defect in its analysis: the fact that nonresident fishermen, pay .multiple California taxes too, yet nonetheless commence each fishing season thousands of dollars in the hole by virtue of California’s discriminatory differentials. To avoid dealing with this problem, the majority employs the analytical head fake of fixating on the named plaintiffs and ignoring the rest of the class. It then opines that the named plaintiffs’ tax liability is de minimus, assumes that finding is representative, and concludes that its analysis need go no further.
That approach is deeply flawed. Our analysis cannot properly ignore the bevy of taxes nonresident fishermen pay collectively to the State. Moreover, the majority improperly transposes the evidentiary burden: it is California that must demonstrate that the differentials recoup a subsidy funded only by .its residents. Hence, any purported lack of evidence on the tax liability of nonresident fishermen counts against the State, not the other way around. The majority shrugs this off, and thereby fails to require California to bear the burden the Privileges and Immunities Clause demands.
California, like the majority, overlooks how nonresident taxes defray the costs of any subsidy for conservation, and thereby fails to meet its burden to show its discrimination is “closely drawn” to the achievement of a substantial state objective; Sup. Ct. of Va. v. Friedman, 487 U.S. 59, 68, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988). For that reason, I would affirm the district court’s judgment in favor.of the plaintiffs, and I respectfully dissent.
I.
Salvatore Papetti and his wife Nancy fish for herring together in a two person team. They make the trip to San Francisco from Bellingham, Washington, to fish on their .boat, the “Pacman.” It is tough work—“being on the ocean day and night, your body wears out” because “when there’s fish, you just got to go go go go ... they’re here today and they’re gone tomorrow .... You got to catch as much as you can when you can.” They fish “five days a *856 week, 24 hours a day, Sunday sundown till Friday noon.” They land their catch every day while the fish are still fresh to ensure the bounty does not spoil.
They hold two commercial fishing licenses, three herring gill net permits, and one commercial fishing vessel registration. This would cost them $1566.50 in license fees if they were California residents, using the majority’s numbers from 2010. California, however, extracts $5482.00 from the Papettis, based simply on their status as nonresidents. So, Salvatore and Nancy start the season with a $3915.50 deficit, relative to their in-state competitors. Adding insult to injury, every year it gets worse because commercial fishing fees are automatically indexed for inflation. Cal. Fish & Game Code § 713 (2013). The effect of the indexing is to widen the gap between resident and nonresident fishing license fees each season.
Savior Papetti—Nancy and Salvatore’s son—must endure the same built-in headwinds. He registers a boat in California, obtains a fishing license, and secures permits to fish for herring and crab. But since he hails from McKinney, Texas, he starts each season $2062.00 behind his California resident competitors. Kevin Marilley is no different. He sets sail on the “Sundance Kid” near San Francisco to fish for herring. He registers his boat, obtains a fishing license, and has three herring gill net permits, so he starts $3674.50 in the red, unlike his California resident competitors. Frustrated by the disadvantage, Marilley and the Papettis challenge four of California’s differential fees under the Privileges and Immunities Clause of the U.S. Constitution.
A.
The Privileges and Immunities Clause is one of the cornerstones upon which our nation was built. Its origins add an important perspective on the State’s burden in this dispute.
After the revolution, “[t]he strong sympathies ... which bound the States together during a common war, dissolved on the return of peace.” Gibbons v. Ogden, 22 U.S. (9 Wheat. 1), 223, 6 L.Ed. 23 (1824) (Johnson, J. concurring). For the first time, the states found themselves “in the unlimited possession of those powers over their own commerce, which they had so long been deprived of, and so earnestly coveted.” Id. at 224. State parochialism “began to show itself in iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States.” Id.
New York, for instance, obtained firewood from Connecticut and goods from the farms of New Jersey, but because such trade harmed domestic industry, the State required “every Yankee sloop” and “Jersey market boat” to pay an entrance fee and a duty. John Fiske, The Critical PeriOD OF American History, 1783-1789 150-52 (1897). New Jersey retaliated by laying a tax on property New York had acquired in Sandy Hook. Id. at 152. Connecticut’s merchants refused “to send any goods whatever into the hated state for a period of twelve months.” Id. Yet, as three other New England states “closed their ports to British shipping,” Connecticut saw fit to “thr[ow] hers wide open, an act which she followed up by laying duties upon imports from Massachusetts.” Id. at 148-49. Connecticut’s practice of “denying to outlan-ders the treatment that its citizens demanded for themselves was widespread.” Austin v. New Hampshire, 420 U.S. 656, 660, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). “This came to threaten at once the peace and safety of the union.” H. P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 533, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (internal quotation marks omitted).
*857 The new country initially tried to solve the problem with the toothless Articles of Confederation, which provided:
The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States ... shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions as the inhabitants thereof....
Art. IV. Since no state could unilaterally enforce this provision, the economic interaction of the several states became more and more fraught. Ultimately, this internecine, economic fratricide became “the immediate cause[ ] that led to the forming of a [constitutional] convention.” Gibbons, 22 U.S. at 224; see also Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 82 (17th ed. 2010) (“The poor condition of American commerce and the proliferating trade rivalries among the states were the immediate provocations for the calling of the Constitutional Convention.”).
The Privileges and Immunities Clause was primarily aimed at “creating] a national economic union,” Sup. Ct. of N.H. v. Piper, 470 U.S. 274, 279-80, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), and was taken from the Articles of Confederation “with no change of substance or intent, unless it was to strengthen the force of the clause in fashioning a single nation,” Austin, 420 U.S. at 661, 95 S.Ct. 1191. It affirms “[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.” U.S. Const. art. IV, § 2, cl. 1. Alexander Hamilton referred to the Clause quite simply as “the basis of the Union.” The Federalist No. 80, at 502 (B. Wright ed., 1961). It “place[d] the citizens- of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.” Paul v. Virginia, 75 U.S. (8 Wall. 168), 180, 19 L.Ed. 357 (1868). The Court found it gave outsiders “an exemption from higher taxes or impositions than are paid by the other citizens of the state.” Corfield v. Coryell, 6 F.Cas. 546, 552 (No. 3,230) (Cir. Ct. E.D. Pa. 1823). “It has been justly said that no [other] provision in the Constitution has tended so strongly to constitute the citizens of the United States one people....” Paul, 75 U.S. at 180.
B.
In light of this background, when states erect barriers that impair our national economic unity, they bear a significant burden of justification: laws implicating the Clause must serve a “substantial state interest” and be “closely related” to the advancement of that interest to be valid. Friedman, 487 U.S. at 65, 108 S.Ct. 2260. A substantial interest does not exist, “unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the [discriminatoiy] statute is aimed.” Hicklin v. Orbeck, 437 U.S. 518, 525-26, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (quotation marks omitted, brackets in original). States of course do have some flexibility in prescribing appropriate cures for local ills and, when levying fees, need not demonstrate . mathematical precision. See Toomer v. Witsell, 334 U.S. 385, 396, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). But citizens of State A must be allowed to do business in State B “on terms of substantial equality with the citizens of that State.” Id. (emphasis added).
C.
The “evil” the fee differentials target in this case is the potential for nonresidents *858 to “free ride” on California’s investment in its fisheries.[1] The State’s valid interest thus lies in seeking reimbursement for a benefit funded exclusively by California residents-. In this situation, California may exact only “a differential which would merely compensate the State for [1] any added enforcement burden [nonresidents] may impose or [2] for any conservation expenditures from taxes which only residents pay.” Toomer, 334 U.S. at 399, 68 S.Ct. 1156 (emphasis added).[2]
California elected to put all of its eggs in the second basket, as it never asserted, much less provided any evidence, that nonresident commercial fishermen impose any added enforcement or management burden on the State.[3] In conducting our analysis, we thus look to the aggregate benefits nonresident fishermen receive at the expense of California’s taxpayers. To calculate that benefit, I will leverage, but do not endorse, the majority’s handiwork.
The majority assumes the $20 million spent on licensing and enforcement is akin to conservation. Maj. Op. at 851. It then finds a $14,635,000 shortfall, after accounting for $5,365,000 received in fees, not including differentials. Id. Next, the majority assumes commercial fishermen benefit-ted from the subsidy in proportion to the amount they paid in fees ($1,980,000 / $5,365,000),[4] Id. That equals thirty-seven (37) percent of the $14,635,000 shortfall, meaning fishermen were subsidized to the tune of $5,341,000. Id. at 851. Since nonresidents account for twelve percent of commercial fishermen, the majority tags *859 them with twelve percent of that amount. Id. at 851. In other words, according to the majority, nonresident fishermen received a $641,000 “subsidy.” Id.
This analysis fails because it assumes that the State’s subsidy derives from “taxes which only residents pay,” Toomer, 334 U.S. at 399, 68 S.Ct. 1156, notwithstanding the fact that the record shows that nonresident commercial fisherman pay California taxes as well. Nonresident fishermen, in other words, must “be assimilated, either entirely or in part, to California resident taxpayers for purposes of the Privileges and Immunities Clause,” Maj. Op. at 853, because—like Golden State residents— they too pay taxes to fund the State’s conservation expenditures.
II.
•A.
The State’s expert, Dr. Carriker, sdys commercial fishermen in California earned $150 million in 2009, $179 million in 2010, and $204 million in 2011. The State also consistently represented it could charge fees to nonresident fishermen in relation to their percentage of overall fishermen. Thus, taking the majority’s number, we can attribute twelve percent of those earnings to the efforts of out-of-state fishermen. By that account, nonresident fishermen paid personal income taxes to the State on earnings approximating $18-$24 million.[5]
We can also consider it in another way. Using the landings data submitted both for residents and nonresidents, Dr. Carriker submits that the “average per-fisherman income” in California was $91,293.03 in 2009, $105,858.00 in 2010, and $105,070.28 in 2011. If we assume nonresident fishermen are comparable to their in-state counterparts, nonresidents would be liable for at least 9.3 percent in personal income taxes on roughly those amounts. See Franchise Tax Board, 2014 Annual Report tbl. Al-B (2014), available at https://www.ftb. ca.gov/Archive/AboutFTB/Tax_Statistics/ Reports/2014/AnnuaLReport. shtml#Tax_Rates (showing personal income tax rates for each income level from 1935 to 2014) [hereinafter 2014 FTB Report],
Alternatively, if we divide the aggregate earnings (approximately $24 million) by the number of nonresident fishermen (775),. nonresidents would be paying California taxes on $.31,000 per year on average. This estimate, however, assumes income is distributed evenly, notwithstanding the fish will bite for some fishermen more than others. Accordingly, $31,000 might be construed as the median income, meaning half of nonresident fishermen would make more each year, and the other half less. In that scenario, it would not be surprising for the named plaintiffs to have made modest in-state tax payments, even, where nonresident fisherman collectively contribute substantially.
California never contemplated, much less accounted for, the contributions nonresident fishermen make in personal income taxes.[6] Based on the evidence in the *860 record, however, we can reasonably infer nonresident fishermen’s incomes contribute meaningfully in the aggregate to the State’s conservation expenditures. See, e.g., SER 20 (“[A] substantial portion of General Fund revenue comes from nonresident sources, including personal income tax paid by nonresidents, including nonresident commercial fishermen.”).
Consider also the fact that California derives close to thirty percent of the General Fund from sales and use tax revenue. Nonresident fishermen like the Papettis pay those taxes just as California residents do—to purchase food, fuel, and other necessary materials in California. I assume that nonresident fishermen are also a salty bunch, and likely pay excise taxes too, on cigarettes, beer, wine, and alcohol, thereby adding further to the State’s general revenue. Yet California makes no effort to account for any of these nonresident funds in justifying its fee differentials, or to explain how nonresidents remain on the “same footing” ' as residents in spite of them. That simply is unjustifiable; under the Privileges and Immunities Clause California is required to do more. See Mullaney v. Anderson, 342 U.S. 415, 418, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (“[Something more.is required than bald assertion to establish a reasonable relation between the higher fees and the higher cost[s] to the [State].”); Tangier Sound Waterman’s Ass’n v. Pruitt, 4 F.3d 264, 267 (4th Cir. 1993) (finding differential not “closely related” to asserted interest because, among other things, State gave “no recognition” to sales and use taxes paid by nonresident fishermen); Carlson v. State, 798 P.2d 1269, 1278 (Alaska 1990) (reading Toomer “to mean that if nonresident fishermen paid the same taxes as Alaskans’ and these taxes were substantially the sole revenue source for the state out of which conservation expenditures were made, then differential fees would not be permissible”).
. The majority concedes its analysis would have to be “modif[ied]” if nonresident fisherman “paid more than de minimus” taxes to California, Maj. Op. at 853, but it shrugs off the few thousands of dollars the named plaintiffs paid to California as being insufficient to meet its novel standard. By itself, this is error—the State must demonstrate “a reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them.” Toomer, 334 U.S. at 399, 68 S.Ct. 1156 (emphasis added). In this case, California has failed to make any such showing.
Apparently unable to respond more adequately to our argument, the majority steps purposefully to the plate, swings as hard as it can, and whiffs, by fixating on Rule ,23’s class certification standards. Emphatically, those standards do not require that class members be carbon copies, of each other. They therefore cannot excuse the majority’s failure to grapple with the hole in its argument. For instance, the majority invokes “commonality,” but “[t]he existence of shared legal issues with divergent factual predicates is sufficient” to meet that “permissive” standard. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998) (emphasis added). Likewise, “typicality” requires “only that [the named plaintiffs’] claims be ‘typical’ of the class, not that [the named plaintiffs] be identically positioned to each other or to every class member.” Parsons v. Ryan, 754 F.3d 657, 686 (9th Cir. 2014); see also Ellis v. Costco Wholesale Corp., 657 F.3d 970, 985 n.9 (9th Cir. 2011) (“Differing factual sce *861 narios resulting in a claim of the same nature as other class members does not defeat typicality.”).
Here, the district court found both elements satisfied because the plaintiffs “articulated a common constitutional issue at the heart of each proposed class member’s claim for relief,” and resolution of that issue “would inform similar claims by other proposed class members regardless of factual differences among class members.” This finding by no means warrants the majority’s factual assumption that every class member paid the same amount as the named plaintiffs in state taxes to California. Maj. Op. at 854. Indeed, Rule 23 requires only that each class member here pay fees higher than those charged to instate residents. And, though the extent of nonresident tax liability might be a com-, mon question, Rule 23 permits certification even where the answer varies based on the unique factual circumstances of each nonresident fisherman. In short, neither “commonality” nor “typicality” mean the majority must assume every nonresident fisherman, across all species, location, and circumstance, earned the same income as the named plaintiffs and owed the same taxes to the state of California. Maj. Op. at 853-54. In fact, the opposite conclusion is more reasonable given some nonresidents fish for herring, others for crab, and still others for both, to say nothing of the fishermen who add outings for crayfish or lobster, amongst many other commodities. Were it not evident enough that the majority is seeking to avoid the elephant in the room, it bemoans the absence of any information about the income taxes nonresident fishermen pay to California, id. at 853, without even considering the aggregate statistics cited above, and the reasonable inferences drawn from those data.[7]
Even if we accept the majority’s framing, the named plaintiffs can still “be assimilated ... to California resident taxpayers.” Maj. Op. at 853. We have no reason to believe that fishermen are any different from resident and nonresident tax-filers in the State more generally. And whereas *862 fifty-eight (58) percent of resident filers owe personal income taxes to California, sixty (60) percent of nonresident filers owe them.[8] Compare 2014 FTB Report ,tbl.B-4A (showing 58.4 percent of residents returns were taxable in 2013), with id. tbl.B-4G (showing 60.2 percent nonresident returns were taxable in 2013). So, like ordinary .Californians, some nonresident fishermen pay the State more in personal income taxes than others, but like Californians generally, nonresident fishermen contribute meaningfully to the State’s coffers collectively. All told, the majority improperly focuses on a few fishermen whose contributions it deems insignificant on the overall tax liability spectrum, but the record reflects, and common sense dictates, nonresident fishermen’s taxes contribute materially to conservation expenditures.
B.
By chalking up to a rounding error the taxes nonresidents pay, the majority effectively shifts the applicable burden. Yet, any purported lack of evidence on the tax liability of nonresident fishermen is a strike against California, not against the plaintiffs. It is California that shoulders the burden to demonstrate that its discrimination “bears a close relation to the achievement- of substantial state objectives.” Friedman, 487 U.S. at 70, 108 S.Ct. 2260. Moreover, it is California that must demonstrate its differentials “merely compensate” for expenditures that derive from taxes “which only residents pay.” Toomer, 334 U.S. at 399, 68 S.Ct. 1156. Finally, it is California that must demonstrate it permits nonresident fishermen to do business “on terms of substantial equality” with citizens of the State. Id. at 396, 68 S.Ct. 1156. Unfortunately, the majority lets California off the hook, for while the State is owed some deference, it made no effort to account for nonresident taxes whatsoever. California simply fails to meet its burden. The upshot is that nonresident fishermen stand on different footing than residents, whether fisherman or not. They alone pay differentials but must also pay the same taxes on income earned within the State.,
To illustrate, the 775 nonresident fishermen can be charged for a $641,000 “subsidy,” even though they pay state taxes to cover this conservation expenditure; Instate fishermen, by contrast, receive a $4,700,080 subsidy, but California’s 15,000,-000 taxpayers collectively foot the bill. Accordingly, using the majority’s numbers, California residents, whether fisherman or not, pay about thirty cents on average towards the subsidy to in-state fishermen, whereas nonresident fishermen are charged over $800 each on average for the “subsidy” they receive.[9]
It bears repeating: California shoulders the burden of showing the additional fees *863 charged to nonresidents are closely related to the “taxes which only residents pay,” Toomer, 334 U.S. at 399, 68 S.Ct. 1156, and California must permit nonresident fishermen to do business on terms of substantial equality with citizens of the State. By overlooking how the taxes nonresident fisheririen pay the State defray the costs of any subsidy for conservation, California fails to meet its burden. The fee differentials must accordingly be struck down.
C.
If left to stand on this showing, we have no reason to think interstate fee differentials will not proliferate. Indeed, California could, for example, charge nonresident truckers and commercial airline phots fees for earning a living off state-subsidized highways and airports. And why wouldn’t states seek to recoup from those professions conservation expenditures aimed at maintaining air quality? As in this case, they need only intend to close a budget gap and need not identify any relationship between the shortfall and nonresident truckers or pilots. Further, they need not determine what burdens nonresidents impose, if any, on the state’s air, roads, and other infrastructure. Nor would they need to identify any savings the state would realize if nonresident truckers and pilots were excluded. Finally, they could, like California, ignore nonresident taxes in setting the fee, so long as a few of the truckers or pilots earned incomes that led to modest in-state tax payments. The Privileges and Immunities Clause should preclude such barriers because they disrupt interstate economic harmony unjustifiably. The majority unfortunately holds otherwise, and thereby subverts one of the most important economic compacts that initially bound us together.
III.
This country is more than a league of confederated states—it is a nation. Yet the enactment' of discriminatory fee differentials promotes our economic balkanization. We must be mindful of competing interests when evaluating such measures, but they require ample justification. California’s showing in this case does not come close to meeting its burden, so' the fee differentials are illegal under the Privileges and Immunities Clause. I respectfully dissent.

,The California legislature, never articulated this aim, but the State insists the fee differentials were passed to close a budget gap. It is undisputed that nonresident fishermen were never actually identified as a unique source of any problem that would justify charging them a differential. Additionally, as "the Clause forbids a State from intentionally giving its own citizens a competitive advantage in business or employment,” it is appropriate to examine whether the differentials were enacted for a protectionist purpose. McBurney v. Young, — U.S. —, 133 S.Ct. 1709, 1716, 185 L.Ed.2d 758 (2013). Here, California’s enactment of the Dungeness crab fee differential bears the hallmarks of economic protectionism. As the district court observed, the California Assembly Committee on Water, Parks, and Wildlife opposed an early version of the bill, noting it "provided[d] an unfair advantage to the sponsors of the bill—the Pacific Coast Federation of Fisherman [sic] [a resident fishermen advocacy group]—by making it very difficult for any new crab fishers to obtain permits and enter the market.” The Department of Fish and Game ("DFG”) later commented "[t]his bill is an attempt to ... control competition to California fishermen and processors from out of state.” DFG’s enrolled bill report described the legislation as "an industry sponsored bill to prevent out-of-state commercial fishermen from moving into California and getting an undue share of the California Dungeness crab resource.” When the fee was renewed in 2006, Senate Republican analysis of the bill observed "where resource management crosses the line into economic protectionism it should be opposed ... DFG should explore other management options that focus on maintaining the crab population instead of the industry population.”

. The majority suggests that “a state's expenditures may justify discrimination against nonresidents.” Maj. Op. at 849. But the cases it cites involve the Commerce Clause, not the Privileges and Immunities Clause, and assume that nonresidents do not “fund the state treasury." Reeves, Inc. v. Stake, 447 U.S. 429, 442, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); McBurney v. Young, — U.S. —, 133 S.Ct. 1709, 1712-13, 185 L.Ed.2d 758 (2013) (quoting Reeves, 447 U.S. at 224, 100 S.Ct. 2271).

. The State concedes it did not analyze the impact of nonresident commercial fishermen on its fisheries generally, nor identify any savings it would realize if nonresidents were excluded from participating in its fisheries. As such, there is no evidence in the record that the differentials compensate for any added burden or expense nonresidents impose on commercial fisheries.

. The State never advanced, let alone justified, this assumption.

. To be clear, California taxes the income of nonresidents "derived from sources within this state,” Cal. Rev. & Tax. Code § 17041 (i)(l)(B), "including income from a business, trade, or profession carried on within this State.” Cal. Code Regs. tit. 18, § 17951-2. California also imposes a property tax on boats, including those registered in California but located outside of it. See California State Board of Equalization, Frequently ,Asl<ed Questions—Personal Property, https://www.boe.ca.gov/proptaxes/faqs/ personal.htm.

. Regardless of when the issue was raised, the above evidence has always been in the record, and we review a district court’s decision *860 granting a motion for summary judgment de novo. Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1086 (9th Cir. 2013).

. The majority asserts our inferences are unsupported, but that is incorrect. Our assessment derives from the aggregate earnings statistics California placed into the record, which were taken from landings data submitted both for resident and nonresident commercial fishermen. See supra II.A. We do not claim, as the majority states, that every unnamed class member makes "substantially more” than the named plaintiffs. Maj. Op. at 854. Our argument is that the record reasonably reflects that nonresident fishermen— taken collectively, across the full range of their income distribution—pay taxes that contribute materially to the State’s conservation expenditures (a fact California completely ignores). Unlike the majority’s hypothesis, under which unnamed class members are clones of the named plaintiffs, our assessment comports with common sense. We appreciate that 775 fisherman—some of whom fish the whole year in California, others of whom fish part-time—will earn incomes that fall along a distribution, such that some will owe California income taxes, and others will not. Given that point, the majority has no basis, under Rule 23 or otherwise, to assume the California tax liability of the three named plaintiffs is broadly representative. More importantly, it-is California’s burden to demonstrate our understanding is untrue in order to justify its discriminatory differentials, It has made no such showing in this case.
Next, while it is true that ”[i]f a claim based on the payment of California income taxes had been made in the district court, that claim was required to have been based on law or fact 'common to the class,' ” Maj. Op. at 854, that observation affords the majority no help. The law common to the class is the constitutional issue under the Privileges and Immunities Clause, and Rule 23(a)(2), stated in the disjunctive, requires nothing more. In other words, the only common "claim” that is required by Rule 23 to appear in the complaint is the one the plaintiffs advanced—that each class member pays fees higher than those charged to California residents.

. The Franchise Tax Board’s 2014 Annual Report is the most recent available data.

. Notably, Carlson rejected the "proposition that the state may subsidize its own residents in the pursuit of their business activities and not similarly situated nonresidents, even though this results in substantial inequality of treatment.” 798 P.2d at 1278, The court found such a system "economically indistinguishable from imposing a facially equal tax on residents and nonresidents while making it effectively unequal by a system of credits and exemptions.” Id. It declined to strike down the differential imposed by Alaska on this basis because state taxes were not "substantially the sole revenue source” for conservation, expenditures. Id. (noting 86 percent of state revenues derived from petroleum production). The opposite is true here—personal income tax and sales tax made up 86 percent of General Fund revenues for the year ending June 30, 2015. See California State Controller's Office, Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2015 42 (2016), available at http://www.sco.ca.gov/ Files-ARD-Local/LocRep/cafrl5web.pdf.