**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEVIN MARILLEY; SALVATORE
PAPETTI; SAVIOR PAPETTI, on
behalf of themselves and
similarly situated,
           *Plaintiffs-Appellees*,

v.

CHARLTON H. BONHAM, in his
official capacity as Director of
the California Department of
Fish and Game,
           *Defendant-Appellant*.

No. 13-17358

D.C. No.
4:11-cv-02418-DMR

OPINION

Appeal from the United States District Court
for the Northern District of California
Donna M. Ryu, Magistrate Judge, Presiding

Argued and Submitted En Banc June 21, 2016
San Francisco, California

Filed December 21, 2016

Before: Sidney R. Thomas, Chief Judge, and Stephen Reinhardt, Kim McLane Wardlaw, William A. Fletcher, Marsha S. Berzon, Milan D. Smith, Jr., Mary H. Murguia, Jacqueline H. Nguyen, Andrew D. Hurwitz, John B. Owens, and Michelle T. Friedland, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Milan D. Smith, Jr.;
Dissent by Judge Reinhardt

## SUMMARY[*]

### Civil Rights

The en banc court reversed the district court's summary judgment in favor of plaintiffs and remanded for the district court to enter summary judgment for California in an action brought by a class of nonresident commercial fishers challenging California's nonresident fee differential for four commercial fishing licenses, vessel registration and permits.

The en banc court first held that California's fee differentials for commercial fishing vessel registrations, fishing licenses, Dungeness crab permits, and herring gill net permits fell within the purview of the Privileges and Immunities Clause. The en banc court determined that whether the calculation was made at the general level of all nonresident commercial fishers, or at the specific level of nonresident commercial fishers for Dungeness crab and

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

herring, the fee differentials charged by California were less than the amount by which California subsidized the management of the nonresidents' portions of its commercial fishery. The en banc court therefore held that the fee differentials survived the Privileges and Immunities Clause challenge because the differentials were justified by a substantial reason that was closely related to the differential fees.

The en banc court held that the fees survived an Equal Protection Clause challenge because California's interest in receiving compensation for its commercial fishery management provided a "rational basis" for its fee differentials.

Dissenting, Judge M. Smith, joined in full by Hurwitz and Owens and by Reinhardt and Berzon as to Part III, stated the majority assumed away the major defect in its analysis: the fact that nonresident fishermen pay multiple California taxes too, yet nonetheless commence each fishing season thousands of dollars in the hole by virtue of California's discriminatory differentials. In Judge M. Smith's view, the fee differentials are illegal under the Privileges and Immunities Clause.

Dissenting, Judge Reinhardt, joined by Judge Berzon, concurred in Part III of Judge M. Smith's dissent and agreed that California failed to carry its burden of demonstrating that the differential fees it charges to nonresidents were closely drawn to the achievement of a substantial state objective.

**COUNSEL**

M. Elaine Meckenstock (argued) and Gary Alexander, Deputy Attorneys General; Annadel A. Almendras, Supervising Deputy Attorney General; Robert W. Byrne, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, Oakland, California; for Defendant-Appellant.

Stuart G. Gross (argued) and Jared M. Galanis, Gross Law, San Francisco, California; Todd R. Gregorian and Tyler A. Baker, Fenwick & West LLP, Mountain View, California; for Plaintiffs-Appellees.

**OPINION**

W. FLETCHER, Circuit Judge:

California charges nonresident commercial fishers higher fees for vessel registrations, licenses, and permits than it charges resident commercial fishers. A certified class of nonresident commercial fishers challenges the fee differentials under the Privileges and Immunities Clause and the Equal Protection Clause. We hold that California's fee differentials do not violate either clause.

## I. Background

California requires both resident and nonresident commercial fishers to register their vessels and to purchase licenses and permits in order to engage in commercial fishing in the waters of the state. *See* Cal. Fish & Game Code §§ 7852, 7881 (2013). For many years, California has

managed its commercial fishery at a substantial loss. *See* Cal. Fish & Game Code §§ 710.5(a), 710.7(a)(1) (2007). In Fiscal Year (FY) 2010–11, the year for which we have the most extensive documentation in the record, California's Department of Fish and Game spent approximately $20 million managing its commercial fishery. In the same year, California received approximately $5.8 million in fees—including registration, license, and permit fees paid by residents and nonresidents—from participants in its commercial fishing industry. The approximately $14 million shortfall was covered by California's general tax revenues.

California has statutorily mandated fees for commercial fishing vessel registrations, licenses, and permits. *See* Cal. Fish & Game Code §§ 713, 7852, 7881, 8280.6, 8550.5. Fees are adjusted annually based on inflation. Beginning in 1986, California charged nonresidents more than residents for certain commercial fishing registrations, licenses, and permits. In 1986, California for the first time charged nonresidents more than residents for herring gill net permits. In 1993, California for the first time charged nonresidents more for commercial fishing vessel registrations and commercial fishing licenses. In 1995, California for the first time charged nonresidents more for Dungeness crab permits.

In license year 2010, the fees for resident and nonresident commercial fishers were as follows:

Commercial fishing vessel registration:
    Resident: $317.00
    Nonresident: $951.50

Commercial fishing license:
   Resident: $120.75
   Nonresident: $361.75

Dungeness crab vessel permits:
   Resident: $254.00
   Nonresident: $507.50

Herring gill net permits:
   Resident: $336.00
   Nonresident: $1,269.00

Cal. Dep't Fish & Game, *Digest of California Commercial Fishing Laws and Licensing Requirements* (2010). Dungeness crab and herring were (and are) limited entry fisheries for which a limited number of permits was (and is) available.

Depending on the activity in question, a commercial fisher in California could be required to pay several fees. For example, a fishing vessel owner who personally engaged in fishing for herring was required to pay a vessel registration fee, a commercial fishing license fee, and a herring gill net permit fee. For a California resident holding a single permit, the total cost in 2010 would have been $773.75. For a nonresident, the total cost would have been $2,582.25, or 3.3 times as much as for a resident. A vessel owner who personally engaged in fishing for Dungeness crab was required to pay a vessel registration fee, a commercial fishing license fee, and a Dungeness crab permit fee. For a California resident, the total cost in 2010 would have been $691.75; for a nonresident, the total cost would have been $1,820.75, or 2.6 times as much as for a resident. Of the approximately $5.8 million in fees paid to California in FY

2010–11 by the commercial fishing industry, approximately $435,000 came from fee differentials paid by nonresidents.

Plaintiffs, a class of nonresident commercial fishers, challenge the four nonresident fee differentials—for commercial fishing vessel registrations, commercial fishing licenses, Dungeness crab permits, and herring gill net permits. Plaintiffs brought a class action in district court against California's Director of the Department of Fish and Game (for convenience, "California"), challenging the fee differentials as violating the dormant Commerce Clause, the Privileges and Immunities Clause, and the Equal Protection Clause. Plaintiffs voluntarily dismissed their dormant commerce clause claim. The parties filed cross-motions for summary judgment on the remaining two claims. The district court ruled for the plaintiff class on its privileges and immunities claim, did not reach its equal protection claim, and entered judgment under Federal Rule of Civil Procedure 54(b). California appealed the grant of Plaintiffs' motion for summary judgment and the denial of its own motion for summary judgment. A divided three-judge panel of this court affirmed. *Marilley v. Bonham*, 802 F.3d 958 (9th Cir. 2015). We granted rehearing en banc. *Marilley v. Bonham*, 815 F.3d 1178 (9th Cir. 2016).

For the reasons that follow, we reverse the grant of summary judgment to Plaintiffs. We remand with directions to grant summary judgment to California.

## II. Standard of Review

We review de novo a district court's decision granting or denying a motion for summary judgment. *Rocky Mountain*

*Farmers Union v. Corey*, 730 F.3d 1070, 1086 (9th Cir. 2013).

## III.  Discussion

### A.  Privileges and Immunities

Article IV, Section 2, clause 1, of the Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  The Clause's "primary purpose . . . was to help fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948).  The Clause "establishes a norm of comity" between citizens of separate states. *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975).

A challenge under the Privileges and Immunities Clause entails "a two-step inquiry." *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988); *United Bldg. and Constr. Trades Council v. Camden*, 465 U.S. 208, 218 (1984); *see also Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008).  At step one, the plaintiff bears the burden of showing that the challenged law "fall[s] within the purview of the Privileges and Immunities Clause." *Friedman*, 487 U.S. at 64 (quoting *Camden*, 465 U.S. at 221–22); *see also Schoenefeld v. Schneiderman*, 821 F.3d 273, 279 (2d Cir. 2016) (quoting *Friedman*, 487 U.S. at 64). If the plaintiff makes the required step-one showing, at step two the burden shifts to the state to show that the challenged law is "closely related to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65 (citing *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 284 (1985)); *see also*

*Schoenefeld*, 821 F.3d at 279 (quoting *Friedman*, 487 U.S. at 67).

We address these two steps in turn.

### 1. Purview of the Clause

The "threshold matter" in any Privileges and Immunities Clause case is whether a challenged law "fall[s] within the purview" of the Clause. *Camden*, 465 U.S. at 218 (quoting *Baldwin v. Mont. Fish & Game Comm'n*, 436 U.S. 371, 388 (1978)). A plaintiff must show that the challenged law treats nonresidents differently from residents and impinges upon a "fundamental" privilege or immunity protected by the Clause. *Camden*, 465 U.S. at 218. Because California charges higher fees to nonresident commercial fishers, *see* Cal. Fish & Game Code §§ 7852, 7881, 8280.6, 8550.5, we easily conclude that Plaintiffs' interests are "facially burdened." *McBurney v. Young*, 133 S. Ct. 1709, 1715 (2013); *see also Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66–67 (2003); *Carlson v. State*, 798 P.2d 1269, 1274 (Alaska 1990) ("[L]icense fees which discriminate against nonresidents are *prima facie* a violation of [the Privileges and Immunities Clause]."). Further, an unbroken line of authority characterizes commercial fishing as a "common calling" that is protected by the Privileges and Immunities Clause. *See Mullaney v. Anderson*, 342 U.S. 415, 417–19 (1952) (striking down Alaska's differentials for commercial fishing licenses as violating the Privileges and Immunities Clause); *Toomer*, 334 U.S. at 403 ("[C]ommercial shrimping in the marginal sea, like other common callings, is within the purview of the privileges and immunities clause."); *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 96 (2d Cir. 2003) (holding that "commercial lobstering" falls within the purview of the Privileges and Immunities Clause);

*Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 266 (4th Cir. 1993) (explaining that commercial fishing is a "protected privilege" because it implicates "'the right to earn a living'" (quoting *Toomer*, 344 U.S. at 403)); *Carlson*, 798 P.2d at 1274 ("Commercial fishing is a sufficiently important activity to come within the purview of the Privileges and Immunities Clause.").

We therefore conclude that California's challenged fee differentials fall within the purview of the Privileges and Immunities Clause.

### 2. Closely Related to the Advancement of a Substantial State Interest

#### a. Commercial Fishing Fees and State Subsidy

California's differential fees for nonresident fishers have not reduced the percentage of nonresidents obtaining permits. In license year 1986, the year differential fees were introduced for herring gill net permits, nonresidents held 17.5% of these permits in California. In license year 2012, the most recent year for which we have information in the record, nonresidents held 19% of these permits. In license year 1993, the year differential fees were introduced for commercial fishing vessel registrations and commercial fishing licenses, nonresident commercial fishers held 7.2% of all commercial fishing vessel registrations and 6.6% of all commercial fishing licenses in California. In license year 2012, nonresident commercial fishers registered 9.4% of all commercial fishing vessel registrations and 12.9% of all commercial fishing licenses in California. In license year 1995, the year differential fees were charged for Dungeness

crab permits, nonresidents held 9.8% of these permits. In license year 2012, nonresidents held 13.9% of these permits.

According to a declaration of Tony Warrington, Assistant Chief of the Law Enforcement Division of California's Department of Fish and Game ("DFG") (now the Department of Fish and Wildlife), a "reasonable and conservative estimate" of commercial fishing enforcement expenditures by the Law Enforcement Division in FY 2010–11 is $10,320,963. According to a declaration of Helen Carriker, Deputy Director of Administration of DFG, additional FY 2010–11 expenditures by the License and Revenue Branch of DFG and by the Marine Region of DFG were $9,499,000. Carriker states, however, that these numbers do "not capture all of DFG's commercial fishing costs," and that "all DFG programs benefit commercial fishermen in some way." These numbers also do not include fishing-related conservation expenditures by other California agencies, such as the California Coastal Commission. Based on the numbers provided by Warrington and Carriker, a conservative estimate is that California spent approximately $20,000,000 in FY 2010–11 on enforcement, management, and conservation activities benefitting commercial fishers.

Warrington estimated the FY 2010–11 expenditures by the Law Enforcement Division of DFG attributable to the Dungeness crab fishery as $921,394, and attributable to the herring gill net fishery as $75,094. He noted, however, that these numbers "likely underestimate the enforcement costs for these two fisheries" because not all personnel costs (in terms of both numbers of people and numbers of overtime hours) were included, and because some equipment expenses were not included. Carriker estimated the FY 2010–11 expenditures by the License and Revenue Branch of DFG

attributable to the Dungeness crab fishery as $83,921, and attributable to the herring gill net fishery as $97,431. According to a declaration by Marci Yaremko, Environmental Program Manager for DFG, FY 2010–11 expenditures by the Marine Region of DFG attributable to the Dungeness crab fishery were "at least" $109,797, and attributable to the herring gill net fishery were "at least" $285,981. Combining the expenditures by the Law Enforcement Division, the License and Revenue Branch, and the Marine Region, in FY 2010–11 California's DFG spent at least $1,115,112 attributable to the Dungeness crab fishery and at least $458,506 attributable to the herring gill net fishery.

During FY 2010–11, California residents registered 2,812 commercial fishing vessels; nonresidents registered 304 vessels. Nonresidents' vessels thus accounted for approximately 10% of the total registrations in that year. California residents purchased 5,618 commercial fishing licenses; nonresidents purchased 775 licenses. Nonresidents accounted for approximately 12% of the total licenses. California residents paid the yearly fee for 500 Dungeness crab permits; nonresidents paid the fee for 76 permits. Nonresidents accounted for approximately 13% of the total Dungeness crab permits. California residents paid the yearly fee for 180 herring gill net permits; nonresidents paid the fee for 39 permits. Nonresidents accounted for approximately 18% of the total herring gill net permits.

During FY 2010–11, California received, from residents and nonresidents, a total of approximately $2,415,000 for commercial vessel registrations, commercial fishing licenses, Dungeness crab permits, and herring gill net permits. Of that amount, approximately $435,000 was due to fee differentials

paid by nonresident fishers. Broken down by category, the fee differentials were approximately $193,000 for commercial fishing boat registrations; approximately $187,000 for commercial fishing licenses; approximately $19,000 for Dungeness crab permits; and approximately $36,000 for herring gill net permits.

Overall, during FY 2010–11 California received approximately $5,800,000 in commercial fishing revenues, including revenues from resident and nonresident fishing vessel registrations, fishing licenses, Dungeness crab permits, and herring gill net permits. Using $20,000,000 as the conservative estimate of California's overall commercial fishery expenditures, the FY 2010–11 shortfall was slightly over $14,000,000. If we exclude from the calculation fee differentials paid by nonresidents, the shortfall in FY 2010–11 was approximately $14,435,000. The shortfall was covered by California's general tax revenues. This shortfall was a subsidy, or benefit, provided by California taxpayers to the commercial fishing industry in California. The question before us is whether, or to what degree, nonresident commercial fishers may be required to pay differential fees to account for their proportionate share of that subsidy, or benefit.

### b. Advancement of a Substantive State Interest

#### i. State Expenditures and Compensation by Nonresidents

##### (a) State Expenditures

The Supreme Court has decided two cases in which differential fees were charged to nonresident commercial fishers. First, in *Toomer v. Witsell*, 334 U.S. 385 (1948),

South Carolina charged a license fee of $25 for commercial shrimp boats owned by state residents. It charged a license fee of $2,500—one hundred times greater—to commercial shrimp boats owned by nonresidents. *Id.* at 389. The Court wrote that "South Carolina plainly and frankly discriminates against non-residents, and the record leaves little doubt but what the discrimination is so great that its practical effect is virtually exclusionary." *Id.* at 396–97; *see also id.* at 398 (noting "a near equivalent of total exclusion"). The Court struck down the fee differential as a violation of the Privileges and Immunities Clause. *Id.* at 403. The Court was careful, however, to endorse differential fees that were compensation or reimbursement for state-provided benefits as to which nonresidents would otherwise be free riders. The Court wrote that the Clause allows a state "to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay." *Id.* at 399.

Second, in *Mullaney v. Anderson*, 342 U.S. 415 (1952), the Tax Commissioner of Alaska charged a commercial fishing license fee of $5 to residents and a $50 fee—a ten times greater fee—to nonresidents. Alaska sought to justify the fee differential based on enforcement costs attributable to nonresident commercial fishers, but the record did not support its attempted justification. Indeed, wrote the Court, the Tax Commissioner and his Deputy "specifically disclaimed any knowledge of the dollar cost of enforcement." *Id.* at 418. Applying the Privileges and Immunities Clause to a Territory (as Alaska then was), the Court struck down the fee differential. The Court quoted the language from *Toomer* endorsing differential fees that prevent nonresidents from free riding on state-provided enforcement and conservation

efforts, *id.* at 417, and the Court was careful to say that precise cost and reimbursement figures were not required in order to justify differential fees, *id.* at 418 ("Constitutional issues affecting taxation do not turn on even approximate mathematical determinations.").

To justify the fee differentials challenged in this case, California points to the approximately $14 million yearly shortfall in its expenditures in managing its commercial fishery. As noted above, without the revenue produced by the fee differentials, the yearly shortfall would be an additional $435,000. California contends that the fee differentials charged to nonresident commercial fishers appropriately compensate it for costs incurred in enforcement and conservation efforts attributable to nonresidents as their proportionate share, and that the fee differentials reduce (though do not entirely eliminate) the free-rider problem that would otherwise exist.

On several occasions, the Supreme Court has stated that a state's expenditures may justify discrimination against nonresidents that would otherwise be impermissible under the Privileges and Immunities Clause. As just noted, the Court stated in *Toomer* and *Mullaney* that a state may charge differential fees to nonresident commercial fishers in order to recover the state's expenditures in enforcement and conservation measures that are attributable to the nonresidents. In *Camden*, a municipal ordinance required that at least forty percent of workers employed on city construction projects be residents of Camden, New Jersey. The Court wrote, "The fact that Camden is expending its own funds or funds it administers in . . . terms of a grant is certainly a factor—perhaps the crucial factor—to be considered in evaluating whether the statute's discrimination

violates the Privileges and Immunities Clause." *Camden*, 465 U.S. at 221.

The Court's decisions under the Commerce Clause make much the same point about state expenditures. Commerce Clause decisions are relevant to the Privileges and Immunities Clause because the two clauses share the same underlying concerns. *See*, *e.g.*, *Hicklin v. Orbeck*, 437 U.S. 518, 531–32 (1978) ("[T]he mutually reinforcing relationship between the Privileges and Immunities Clause . . . and the Commerce Clause—a relationship that stems from their common origin in the Fourth Article of the Articles of Confederation and their shared vision of federalism . . . —renders several Commerce Clause decisions appropriate support for our conclusion [under the Privileges and Immunities Clause]." (internal citation omitted)). In *Reeves, Inc. v. Stake*, 447 U.S. 429 (1980), South Dakota built and owned its own cement plant. When demand for cement exceeded supply, South Dakota instituted a policy of satisfying all orders from South Dakota customers first, relegating out-of-state customers to the end of the line. The Court sustained the policy against a dormant Commerce Clause challenge, writing:

> The State's refusal to sell to buyers other than South Dakotans is "protectionist" only in the sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve . . . . Such policies, while perhaps "protectionist" in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State.

*Id.* at 442.  Similarly, in *McBurney v. Young*, 133 S.Ct. 1709 (2013), the Supreme Court rejected a dormant Commerce Clause challenge to a Virginia Freedom of Information Act provision under which only Virginia residents were allowed to compel production of state government documents.  Citing *Reeves*, the Court wrote, "Insofar as there is a 'market' for public documents in Virginia, it is a market for a product that the Commonwealth has created and of which the Commonwealth is the sole manufacturer." *Id.* at 1720.  The Court therefore held that Virginia could reserve for its citizens the benefits of the product it had created through the expenditure of state funds.

### (b) Compensation by Nonresidents for State-provided Benefits

The core principle of the foregoing cases is that when a state makes an expenditure from a fund to which nonresidents do not contribute, and when the state provides a benefit through that expenditure to both residents and nonresidents, the state may exclude nonresidents from the benefit either in whole or in part, or it may seek compensation from nonresidents for the benefit conferred.  When the benefit at issue is access to a natural resource, the state may not exclude nonresidents, but it may seek reimbursement for money spent to manage and preserve the resource.  In such cases, as the Court wrote in *Toomer*, the Privileges and Immunities Clause allows a state "to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay." *Toomer*, 334 U.S. at 399.

Several related principles come from these same cases. First, the benefit provided to a nonresident, and the appropriate amount of compensation from the nonresident, need not be determined with mathematical precision. The constitutional question "do[es] not turn on even approximate mathematical determinations." *Mullaney*, 342 U.S. at 418. Second, we accord states deference in determining the benefit provided and the appropriate amount of compensation. A privileges and immunities inquiry "must . . . be conducted with due regard for the princip[le] that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer*, 334 U.S. at 396. Third, in seeking compensation from nonresidents, a state must treat nonresidents and residents with "substantial equality." *Id.* at 396 ("[I]t was long ago decided that one of the privileges which the [Privileges and Immunities Clause] guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.").

Consistent with these principles, we may calculate at a general level the benefit provided by California and the appropriate compensation from nonresident fishers. California spent approximately $20,000,000 managing its commercial fishing industry in FY 2010–11. Not including the fee differentials paid by nonresident fishers, California received a total amount of approximately $5,365,000 in fees from the commercial fishing industry. This amount includes all fees, not limited to commercial fishing license fees, commercial fishing vessel registration fees, Dungeness crab permits, and herring gill net permits. Of that total amount (again excluding the amount paid in fee differentials), approximately $1,980,000 came from registration, license, and permit fees paid by commercial fishers. The remaining

approximately $3,385,000 came from fish landing taxes and from licensing fees paid by fish buyers, sellers, and importers. The shortfall in revenues (excluding nonresident differentials) in FY 2010–11 was approximately $14,635,000, or approximately 73% of the entire amount spent by California in managing its commercial fishery. The shortfall was a subsidy, or benefit, provided by California to its commercial fishing industry, paid by California taxpayers. All commercial fishers in California—residents and nonresidents alike—benefited from this subsidy.

We will assume, as a rough estimate, that commercial fishers as a whole benefited from the states' subsidy in proportion to the amount they paid in fees. Excluding fee differentials, the amount paid to California by commercial fishers ($1,980,000) was 37% of the total amount paid to California by the entire commercial fishing industry ($5,365,000). Thirty-seven percent of the state's $14,635,000 subsidy is approximately $5,341,000. That amount went to commercial fishers as their proportionate share of the subsidy in FY 2010–11. Nonresident commercial fishers in California were 12% of all commercial fishers in FY 2010–11. Twelve percent of the $5,341,000 subsidy that went to all commercial fishers is approximately $641,000. California could have charged up to that amount to nonresident fishers in FY 2010–11, as their proportionate share of the subsidy, or benefit, provided to them by California out of its general fund. In actual fact, nonresident fishers paid a total of $435,000 in fee differentials in FY 2010–11, substantially less than the amount of their proportionate share of the subsidy, or benefit, provided to them by California.

We may also calculate the subsidies provided to the two specific fisheries for which California charges fee differentials—Dungeness crab and herring. As described above, in FY 2010–11 California's DFG spent approximately $1,115,000 attributable to the Dungeness crab fishery and approximately $460,000 attributable to the herring fishery. As noted above, the overall subsidy provided by California to its commercial fishery is 73% of California's total expenditures for managing its commercial fishery. We will assume, as a rough estimate, that 73% of the amount spent on the Dungeness crab and herring fisheries is the amount by which those specific fisheries were subsidized in FY 2010–11.

Seventy-three percent of the subsidy provided to the Dungeness crab fishery is approximately $814,000. Nonresidents were 13% of the Dungeness crab permit holders in FY 2010–11. Thirteen percent of $814,000 is approximately $106,000, which is the proportionate share of the subsidy provided to nonresident Dungeness crab fishers in FY 2010–11. The differential fee charged to nonresident Dungeness crab fishers in FY 2010–11 was approximately $19,000, substantially less than the $106,000 subsidy, or benefit, provided to them.

Seventy-three percent of the subsidy provided to the herring fishery is approximately $335,000. Nonresidents were 18% of the herring gill net permit holders in FY 2010–11. Eighteen percent of $335,000 is approximately $60,000. The differential fee charged to nonresident herring gill net fishers in FY 2010–11 was $36,000, substantially less than the $60,000 subsidy, or benefit, provided to them.

Thus, whether the calculation is made at the general level of all nonresident commercial fishers, or at the specific level of nonresident commercial fishers for Dungeness crab and herring, the fee differentials charged by California are less than the amount by which California subsidizes the management of the nonresidents' portions of its commercial fishery.

In contrast to the fee differential charged in *Toomer*, California commercial fishing differentials are not "virtually exclusionary." *Toomer*, 334 U.S. at 397. Indeed, quite the contrary. As the numbers given above demonstrate, the percentages of nonresident fishing vessel registrations, nonresident commercial fishing licenses, nonresident Dungeness crab permits, and nonresident herring gill net permits have all increased since the institution of differential fees for nonresidents. Further, in contrast to the fee differentials in *Toomer* and *Mullaney*, the multiples of the fees charged to residents are relatively modest. In *Toomer*, South Carolina charged nonresident shrimpers one hundred times what it charged residents. In *Mullaney*, Alaska charged nonresident fishers ten times what it charged residents. In California, the multiples ranged from about two to slightly less than four.

We therefore conclude that the fee differentials charged by California are permitted under the Privileges and Immunities Clause.

ii. California Taxes Paid by Nonresident Fishers

The above analysis is premised on the nonresident fishers in this case not having paid "taxes which only [California] residents pay." *Toomer*, 334 U.S. at 399. Plaintiffs did not

argue in the district court or in their briefs to us that they have paid California income tax on their earnings from commercial fishing in California, and that they are therefore protected by the Privileges and Immunities Clause from having to pay fee differentials. Plaintiffs made this argument for the first time during oral argument before our en banc panel. Our dissenting colleagues use Plaintiffs' late-raised argument as the central rationale of their dissent. We could hold Plaintiffs' argument waived for failure to raise it in the district court and for failure to raise it in their briefs to us. However, we address it on the merits, for there is enough uncontested information in the record to allow us to consider and reject it. Because we reject the argument, there is no unfairness to California resulting from Plaintiffs' failure to raise it until oral argument before our en banc panel.

If Plaintiffs paid more than *de minimus* income tax to California, such that they should be assimilated, either entirely or in part, to California resident taxpayers for purposes of the Privileges and Immunities Clause, we would have to modify our analysis. However, we do not need to do so because the three named plaintiffs have paid either no or minimal California income tax. One of the named plaintiffs has fished commercially in California for many years and has never paid California income tax. The other two named plaintiffs have fished commercially in California for many years; each has paid income taxes in California for only three of those years.

Named plaintiff Savior Papetti lives in McKinney, Texas. He owns two commercial fishing boats. He uses one of them to fish in Alaska. He has kept the other boat in San Francisco since 2000. He does not own any herring gill net permits, but has fished regularly for herring in California, missing only a

few years, by leasing permits from others. He has fished for Dungeness crab regularly since 2006 except for a "couple [of] years." He stated in his deposition that he has filed California tax returns "every year." He specifically stated that he has not paid California income tax since 1992. There is nothing in the record to indicate that he paid California income taxes before 1992.

Named plaintiff Salvatore Papetti, Savior's father, lives in Bellingham, Washington. He states in his deposition that he has worked as a commercial fisherman since 1963. He owns two commercial fishing boats. He keeps one of them in Alaska. He now uses it to fish for salmon, but in the past has used it to fish for Dungeness crab and herring in California. At the time of his deposition, his other boat was in Washington for repairs. He uses that boat to fish for herring in Alaska and in California, and for salmon in Washington. He fished for Dungeness crab in California as late as 2007. About five or six years ago, he sold his crab permit to his son Savior. He has never missed a herring season in California except the year the season was closed due to an oil spill in San Francisco Bay. He has filed California income tax returns "every year," but has paid income taxes to California in only three of those years. He paid $331 in 2004, $652 in 2009, and $2,273 in 2010.

Finally, named plaintiff Kevin Marilley lives in Lynden, Washington. He has worked as a commercial fisherman since 1974. He owns three commercial fishing boats. He keeps two in Alaska and uses them to fish there. He keeps the third boat in Bellingham, Washington, and uses it to fish for salmon in Alaska and herring in California. He fished for squid and herring in California between 1989 and 2005, and fished for squid in California in 2009. He regularly fished for

herring in California through 2007. He stated in his deposition that he intended to fish for herring in California in 2013. He stated in his deposition that he "believe[d]" he filed a California tax return for every year he fished in California up through 2003. The last time he filed a tax return in California was 2003. He paid income tax in California in only three years. He paid $153 in 1994, $3,161 in 1995, and $845 in 1996. He last paid California income tax twenty years ago.

Our dissenting colleagues do not ask to alter our analysis based on the non-existent or minimal California income taxes paid by the three named plaintiffs. Rather, they ask us to do so based on an unsupported assumption that unnamed class members paid substantially more in California income taxes than did the named plaintiffs.

The record contains no evidence of California income taxes paid by any of the unnamed class members. Attorneys for the plaintiff class had an opportunity in the district court to present evidence of California income taxes paid by unnamed class members, but they failed to present any such evidence. Nor did they make any argument in the district court based on payment of California income taxes by any class member, named or unnamed. An assumption that unnamed class members paid substantially more than the named plaintiffs is inconsistent with the basic premises of class certification. Federal Rule of Civil Procedure 23(a)(3) requires that the "claims . . . of the representative parties [be] typical of the claims . . . of the class." That is, a claim by an unnamed member of the class must match a "typical" claim by a named plaintiff. In this case, there is no such "typical" claim in the complaint because the named plaintiffs made no claim whatsoever based on their payment of California

income taxes. Rule 23(a)(2) also requires that there be "questions of law or fact common to the class." If a claim based on the payment of California income taxes had been made in the district court (which it was not), that claim was required to have been based on law or fact "common to the class." To the extent there were facts common to such a claim, if it had been made, the only facts in evidence were those recounted above.

In short, our dissenting colleagues ask us to make an assumption, based on sheer speculation, that unnamed class members paid substantially more in California income taxes than did the named plaintiffs. We respectfully decline to make that assumption.

## B. Equal Protection

Plaintiffs also challenged California's commercial fishing fee differentials under the Equal Protection Clause. The district court struck down the fee differentials as a violation of the Privileges and Immunities Clause and did not reach the equal protection question. We could remand to the district court to address that question in the first instance, but in the interest of judicial efficiency we decide the question ourselves.

Because California's commercial fishing fee differentials do not "classify persons based on protected characteristics, such as race, alienage, national origin, or sex" or "affect the exercise of fundamental rights," rational basis review applies. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 955 (9th Cir. 2005); *see also Country Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988) ("[T]he right to pursue a calling is

not a fundamental right for purposes of the Equal Protection Clause." (citing *New Orleans v. Dukes*, 427 U.S. 297, 303–05 (1976) (per curiam))); *see also Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes."). Therefore, in order to succeed Plaintiffs must "negat[e] every conceivable basis which might support the legislative classification" between residents and nonresidents. *Fields*, 413 F.3d at 955. As explained above, California has a "substantial reason" for charging nonresident differentials. It has an obvious interest in recovering from nonresident commercial fishers their share of the benefit provided to them by its management of its commercial fishery. Congress has recognized this interest as legitimate. *See* Pub. L. No. 109-13, § 6036(b)(1), 119 Stat. 231. But even absent such congressional endorsement, California's interest in receiving compensation for the benefit its management confers provides a "rational basis" for its fee differentials.

## Conclusion

We reverse the district court's grant of summary judgment to Plaintiffs. California's fee differentials for commercial fishing vessel registrations, fishing licenses, Dungeness crab permits, and herring gill net permits survive the Privileges and Immunities Clause challenge because the differentials are justified by a substantial reason that is closely related to the differential fees. The fees survive the Equal Protection Clause challenge because California has a rational basis for charging the differential fees. California is

therefore entitled to summary judgment on both of Plaintiffs' claims. We remand with directions to the district court to enter summary judgment for California.

**REVERSED** and **REMANDED**.

---

M. SMITH, Circuit Judge, with whom HURWITZ and OWENS, Circuit Judges, join in full, and REINHARDT and BERZON, Circuit Judges, join as to Part III, dissenting:

The majority assumes away the major defect in its analysis: the fact that nonresident fishermen pay multiple California taxes too, yet nonetheless commence each fishing season thousands of dollars in the hole by virtue of California's discriminatory differentials. To avoid dealing with this problem, the majority employs the analytical head fake of fixating on the named plaintiffs and ignoring the rest of the class. It then opines that the named plaintiffs' tax liability is *de minimus*, assumes that finding is representative, and concludes that its analysis need go no further.

That approach is deeply flawed. Our analysis cannot properly ignore the bevy of taxes nonresident fishermen pay collectively to the State. Moreover, the majority improperly transposes the evidentiary burden: it is California that must demonstrate that the differentials recoup a subsidy funded only by its residents. Hence, any purported lack of evidence on the tax liability of nonresident fishermen *counts against* the State, not the other way around. The majority shrugs this off, and thereby fails to require California to bear the burden the Privileges and Immunities Clause demands.

California, like the majority, overlooks how nonresident taxes defray the costs of any subsidy for conservation, and thereby fails to meet its burden to show its discrimination is "closely drawn" to the achievement of a substantial state objective. *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 68 (1988). For that reason, I would affirm the district court's judgment in favor of the plaintiffs, and I respectfully dissent.

## I.

Salvatore Papetti and his wife Nancy fish for herring together in a two person team. They make the trip to San Francisco from Bellingham, Washington, to fish on their boat, the "Pacman." It is tough work—"being on the ocean day and night, your body wears out" because "when there's fish, you just got to go go go go . . . they're here today and they're gone tomorrow. . . . You got to catch as much as you can when you can." They fish "five days a week, 24 hours a day, Sunday sundown till Friday noon." They land their catch every day while the fish are still fresh to ensure the bounty does not spoil.

They hold two commercial fishing licenses, three herring gill net permits, and one commercial fishing vessel registration. This would cost them $1566.50 in license fees if they were California residents, using the majority's numbers from 2010. California, however, extracts $5482.00 from the Papettis, based simply on their status as nonresidents. So, Salvatore and Nancy start the season with a $3915.50 deficit, relative to their in-state competitors. Adding insult to injury, every year it gets worse because commercial fishing fees are automatically indexed for inflation. Cal. Fish & Game Code § 713 (2013). The effect

of the indexing is to widen the gap between resident and nonresident fishing license fees each season.

Savior Papetti—Nancy and Salvatore's son—must endure the same built-in headwinds. He registers a boat in California, obtains a fishing license, and secures permits to fish for herring and crab. But since he hails from McKinney, Texas, he starts each season $2062.00 behind his California resident competitors. Kevin Marilley is no different. He sets sail on the "Sundance Kid" near San Francisco to fish for herring. He registers his boat, obtains a fishing license, and has three herring gill net permits, so he starts $3674.50 in the red, unlike his California resident competitors. Frustrated by the disadvantage, Marilley and the Papettis challenge four of California's differential fees under the Privileges and Immunities Clause of the U.S. Constitution.

## A.

The Privileges and Immunities Clause is one of the cornerstones upon which our nation was built. Its origins add an important perspective on the State's burden in this dispute.

After the revolution, "[t]he strong sympathies . . . which bound the States together during a common war, dissolved on the return of peace." *Gibbons v. Ogden*, 22 U.S. 1, 223 (1824) (Johnson, J. concurring). For the first time, the states found themselves "in the unlimited possession of those powers over their own commerce, which they had so long been deprived of, and so earnestly coveted." *Id.* at 224. State parochialism "began to show itself in iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States." *Id.*

New York, for instance, obtained firewood from Connecticut and goods from the farms of New Jersey, but because such trade harmed domestic industry, the State required "every Yankee sloop" and "Jersey market boat" to pay an entrance fee and a duty. JOHN FISKE, THE CRITICAL PERIOD OF AMERICAN HISTORY, 1783–1789 150–52 (1897). New Jersey retaliated by laying a tax on property New York had acquired in Sandy Hook. *Id.* at 152. Connecticut's merchants refused "to send any goods whatever into the hated state for a period of twelve months." *Id.* Yet, as three other New England states "closed their ports to British shipping," Connecticut saw fit to "thr[ow] hers wide open, an act which she followed up by laying duties upon imports from Massachusetts." *Id.* at 148–49. Connecticut's practice of "denying to outlanders the treatment that its citizens demanded for themselves was widespread." *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975). "This came to threaten at once the peace and safety of the union." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533 (1949) (internal quotation marks omitted).

The new country initially tried to solve the problem with the toothless Articles of Confederation, which provided:

> The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States . . . shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties,

impositions, and restrictions as the inhabitants thereof . . . .

Art. IV. Since no state could unilaterally enforce this provision, the economic interaction of the several states became more and more fraught. Ultimately, this internecine, economic fratricide became "the immediate cause[] that led to the forming of a [constitutional] convention." *Gibbons*, 22 U.S. at 224; *see also* KATHLEEN M. SULLIVAN & GERALD GUNTHER, CONSTITUTIONAL LAW 82 (17th ed. 2010) ("The poor condition of American commerce and the proliferating trade rivalries among the states were the immediate provocations for the calling of the Constitutional Convention.")

The Privileges and Immunities Clause was primarily aimed at "creat[ing] a national economic union," *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 279–80 (1985), and was taken from the Articles of Confederation "with no change of substance or intent, unless it was to strengthen the force of the clause in fashioning a single nation," *Austin*, 420 U.S. at 661. It affirms "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. Alexander Hamilton referred to the Clause quite simply as "the basis of the Union." The Federalist No. 80, at 502 (B. Wright ed., 1961). It "place[d] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Paul v. Virginia*, 75 U.S. 168, 180 (1868). The Court found it gave outsiders "an exemption from higher taxes or impositions than are paid by the other citizens of the state." *Corfield v. Coryell*, 6 F.Cas. 546, 552 (No. 3,230) (Cir. Ct. E.D. Pa. 1823). "It has been justly said that no [other] provision in the

Constitution has tended so strongly to constitute the citizens of the United States one people . . . ." *Paul*, 75 U.S. at 180.

## B.

In light of this background, when states erect barriers that impair our national economic unity, they bear a significant burden of justification: laws implicating the Clause must serve a "substantial state interest" and be "closely related" to the advancement of that interest to be valid. *Friedman*, 487 U.S. at 65. A substantial interest does not exist "unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the [discriminatory] statute is aimed." *Hicklin v. Orbeck*, 437 U.S. 518, 525–26 (1978) (quotation marks omitted, brackets in original). States of course do have some flexibility in prescribing appropriate cures for local ills and, when levying fees, need not demonstrate mathematical precision. *See Toomer v. Witsell*, 334 U.S. 385, 396 (1948). But citizens of State A must be allowed to do business in State B "on terms of *substantial equality* with the citizens of that State." *Id.* (emphasis added).

## C.

The "evil" the fee differentials target in this case is the potential for nonresidents to "free ride" on California's investment in its fisheries.[1] The State's valid interest thus lies

---

[1] The California legislature never articulated this aim, but the State insists the fee differentials were passed to close a budget gap. It is undisputed that nonresident fishermen were never actually identified as a unique source of any problem that would justify charging them a differential. Additionally, as "the Clause forbids a State from intentionally

in seeking reimbursement for a benefit funded exclusively by California residents. In this situation, California may exact only "a differential which would merely compensate the State for [1] any added enforcement burden [nonresidents] may impose or [2] for any conservation expenditures from taxes *which only residents pay*." *Toomer*, 334 U.S. at 399 (emphasis added).**[2]**

---

giving its own citizens a competitive advantage in business or employment," it is appropriate to examine whether the differentials were enacted for a protectionist purpose. *McBurney v. Young*, 133 S. Ct. 1709, 1716 (2013). Here, California's enactment of the Dungeness crab fee differential bears the hallmarks of economic protectionism. As the district court observed, the California Assembly Committee on Water, Parks, and Wildlife opposed an early version of the bill, noting it "provided[d] an unfair advantage to the sponsors of the bill – the Pacific Coast Federation of Fisherman [sic] [a resident fishermen advocacy group] – by making it very difficult for any new crab fishers to obtain permits and enter the market." The Department of Fish and Game ("DFG") later commented "[t]his bill is an attempt to . . . control competition to California fishermen and processors from out of state." DFG's enrolled bill report described the legislation as "an industry sponsored bill to prevent out-of-state commercial fishermen from moving into California and getting an undue share of the California Dungeness crab resource." When the fee was renewed in 2006, Senate Republican analysis of the bill observed "where resource management crosses the line into economic protectionism it should be opposed . . . DFG should explore other management options that focus on maintaining the crab population instead of the industry population."

**[2]** The majority suggests that "a state's expenditures may justify discrimination against nonresidents." Maj. Op. at 15. But the cases it cites involve the Commerce Clause, not the Privileges and Immunities Clause, and assume that nonresidents do not "fund the state treasury." *Reeves, Inc. v. Stake*, 447 U.S. 429, 224 (1980); *McBurney v. Young*, 133 S. Ct. 1709, 1712–13 (2013) (quoting *Reeves*, 447 U.S. at 224).

California elected to put all of its eggs in the second basket, as it never asserted, much less provided any evidence, that nonresident commercial fishermen impose any added enforcement or management burden on the State.[3]  In conducting our analysis, we thus look to the aggregate benefits nonresident fishermen receive at the expense of California's taxpayers.  To calculate that benefit, I will leverage, but do not endorse, the majority's handiwork.

The majority assumes the $20 million spent on licensing and enforcement is akin to conservation.  Maj. Op. at 18–19. It then finds a $14,635,000 shortfall, after accounting for $5,365,000 received in fees, not including differentials.  *Id.* Next, the majority assumes commercial fishermen benefitted from the subsidy in proportion to the amount they paid in fees ($1,980,000 / $5,365,000).[4]  *Id.*  That equals thirty-seven (37) percent of the $14,635,000 shortfall, meaning fishermen were subsidized to the tune of $5,341,000.  *Id.* at 19.  Since nonresidents account for twelve percent of commercial fishermen, the majority tags them with twelve percent of that amount.  *Id.* at 19.  In other words, according to the majority, nonresident fishermen received a $641,000 "subsidy."  *Id.*

This analysis fails because it assumes that the State's subsidy derives from "taxes which only residents pay," *Toomer*, 334 U.S. at 399, notwithstanding the fact that the

---

[3] The State concedes it did not analyze the impact of nonresident commercial fishermen on its fisheries generally, nor identify any savings it would realize if nonresidents were excluded from participating in its fisheries.  As such, there is no evidence in the record that the differentials compensate for any added burden or expense nonresidents impose on commercial fisheries.

[4] The State never advanced, let alone justified, this assumption.

record shows that nonresident commercial fisherman pay California taxes as well. Nonresident fishermen, in other words, must "be assimilated, either entirely or in part, to California resident taxpayers for purposes of the Privileges and Immunities Clause," Maj. Op. at 22, because—like Golden State residents—they too pay taxes to fund the State's conservation expenditures.

## II.

### A.

The State's expert, Dr. Carriker, says commercial fishermen in California earned $150 million in 2009, $179 million in 2010, and $204 million in 2011. The State also consistently represented it could charge fees to nonresident fishermen in relation to their percentage of overall fishermen. Thus, taking the majority's number, we can attribute twelve percent of those earnings to the efforts of out-of-state fishermen. By that account, nonresident fishermen paid personal income taxes to the State on earnings approximating $18–$24 million.[5]

We can also consider it in another way. Using the landings data submitted both for residents and nonresidents, Dr. Carriker submits that the "average per-fisherman income"

---

[5] To be clear, California taxes the income of nonresidents "derived from sources within this state," Cal. Rev. & Tax. Code § 17041(i)(1)(B), "including income from a business, trade, or profession carried on within this State." Cal. Code Regs. tit. 18, § 17951-2. California also imposes a property tax on boats, including those registered in California but located outside of it. *See* California State Board of Equalization, Frequently Asked Questions – Personal Property, https://www.boe.ca.gov/proptaxes/faqs/personal.htm.

in California was $91,293.03 in 2009, $105,858.00 in 2010, and $105,070.28 in 2011. If we assume nonresident fishermen are comparable to their in-state counterparts, nonresidents would be liable for at least 9.3 percent in personal income taxes on roughly those amounts. *See* Franchise Tax Board, 2014 ANNUAL REPORT tbl.A1-B (2014), *available at* https://www.ftb.ca.gov/Archive/AboutFTB/Tax_Statistics/Reports/2014/Annual_Report.shtml#Tax_Rates (showing personal income tax rates for each income level from 1935 to 2014) [hereinafter 2014 FTB Report].

Alternatively, if we divide the aggregate earnings (approximately $24 million) by the number of nonresident fishermen (775), nonresidents would be paying California taxes on $31,000 per year on average. This estimate, however, assumes income is distributed evenly, notwithstanding the fish will bite for some fishermen more than others. Accordingly, $31,000 might be construed as the median income, meaning half of nonresident fishermen would make more each year, and the other half less. In that scenario, it would not be surprising for the named plaintiffs to have made modest in-state tax payments, even where nonresident fisherman collectively contribute substantially.

California never contemplated, much less accounted for, the contributions nonresident fishermen make in personal income taxes.[6] Based on the evidence in the record, however, we can reasonably infer nonresident fishermen's incomes

---

[6] Regardless of when the issue was raised, the above evidence has always been in the record, and we review a district court's decision granting a motion for summary judgment de novo. *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1086 (9th Cir. 2013).

contribute meaningfully in the aggregate to the State's conservation expenditures. *See, e.g.*, SER 20 ("[A] substantial portion of General Fund revenue comes from nonresident sources, including personal income tax paid by nonresidents, including nonresident commercial fishermen.").

Consider also the fact that California derives close to thirty percent of the General Fund from sales and use tax revenue. Nonresident fishermen like the Papettis pay those taxes just as California residents do—to purchase food, fuel, and other necessary materials in California. I assume that nonresident fishermen are also a salty bunch, and likely pay excise taxes too, on cigarettes, beer, wine, and alcohol, thereby adding further to the State's general revenue. Yet California makes no effort to account for any of these nonresident funds in justifying its fee differentials, or to explain how nonresidents remain on the "same footing" as residents in spite of them. That simply is unjustifiable; under the Privileges and Immunities Clause California is required to do more. *See Mullaney v. Anderson*, 342 U.S. 415, 418 (1952) ("[S]omething more is required than bald assertion to establish a reasonable relation between the higher fees and the higher cost[s] to the [State]."); *Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 267 (4th Cir. 1993) (finding differential not "closely related" to asserted interest because, among other things, State gave "no recognition" to sales and use taxes paid by nonresident fishermen); *Carlson v. State*, 798 P.2d 1269, 1278 (Alaska 1990) (reading *Toomer* "to mean that if nonresident fishermen paid the same taxes as Alaskans and these taxes were substantially the sole revenue source for the state out of which conservation expenditures were made, then differential fees would not be permissible").

The majority concedes its analysis would have to be "modif[ied]" if nonresident fisherman "paid more than *de minimus*" taxes to California, Maj. Op. at 22, but it shrugs off the few thousands of dollars the named plaintiffs paid to California as being insufficient to meet its novel standard. By itself, this is error—the State must demonstrate "a reasonable relationship between the danger represented by non-citizens, *as a class*, and the severe discrimination practiced upon them." *Toomer*, 334 U.S. at 399 (emphasis added). In this case, California has failed to make any such showing.

Apparently unable to respond more adequately to our argument, the majority steps purposefully to the plate, swings as hard as it can, and whiffs, by fixating on Rule 23's class certification standards. Emphatically, those standards do not require that class members be carbon copies of each other. They therefore cannot excuse the majority's failure to grapple with the hole in its argument. For instance, the majority invokes "commonality," but "[t]he existence of shared legal issues with *divergent factual predicates* is sufficient" to meet that "permissive" standard. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1988) (emphasis added). Likewise, "typicality" requires "only that [the named plaintiffs'] claims be 'typical' of the class, not that [the named plaintiffs] be identically positioned to each other or to every class member." *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011) ("Differing factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality.").

Here, the district court found both elements satisfied because the plaintiffs "articulated a common constitutional issue at the heart of each proposed class member's claim for

relief," and resolution of that issue "would inform similar claims by other proposed class members regardless of factual differences among class members." This finding by no means warrants the majority's factual assumption that every class member paid the same amount as the named plaintiffs in state taxes to California. Maj. Op. at 25. Indeed, Rule 23 requires only that each class member here pay fees higher than those charged to in-state residents. And, though the extent of nonresident tax liability might be a common question, Rule 23 permits certification even where the answer varies based on the unique factual circumstances of each nonresident fisherman. In short, neither "commonality" nor "typicality" mean the majority must assume every nonresident fisherman, across all species, location, and circumstance, earned the same income as the named plaintiffs and owed the same taxes to the state of California. Maj. Op. at 24–25. In fact, the opposite conclusion is more reasonable given some nonresidents fish for herring, others for crab, and still others for both, to say nothing of the fishermen who add outings for crayfish or lobster, amongst many other commodities. Were it not evident enough that the majority is seeking to avoid the elephant in the room, it bemoans the absence of any information about the income taxes nonresident fishermen pay to California, *id.* at 24, without even considering the aggregate statistics cited above, and the reasonable inferences drawn from those data.[7]

---

[7] The majority asserts our inferences are unsupported, but that is incorrect. Our assessment derives from the aggregate earnings statistics California placed into the record, which were taken from landings data submitted both for resident and nonresident commercial fishermen. *See supra* II.A. We do *not* claim, as the majority states, that every unnamed class member makes "substantially more" than the named plaintiffs. Maj. Op. at 24. Our argument is that the record reasonably reflects that nonresident fishermen—taken collectively, across the full range of their

Even if we accept the majority's framing, the named plaintiffs can *still* "be assimilated . . . to California resident taxpayers." Maj. Op. at 22. We have no reason to believe that fishermen are any different from resident and nonresident tax-filers in the State more generally. And whereas fifty-eight (58) percent of resident filers owe personal income taxes to California, *sixty* (60) percent of nonresident filers owe them.[8] *Compare* 2014 FTB Report tbl.B-4A (showing 58.4 percent of residents returns were taxable in 2013), *with id.* tbl.B-4G (showing 60.2 percent nonresident returns were taxable in 2013). So, like ordinary Californians, some nonresident fishermen pay the State more in personal income

_____

income distribution—pay taxes that contribute materially to the State's conservation expenditures (a fact California completely ignores). Unlike the majority's hypothesis, under which unnamed class members are clones of the named plaintiffs, our assessment comports with common sense. We appreciate that 775 fisherman—some of whom fish the whole year in California, others of whom fish part-time—will earn incomes that fall along a distribution, such that some will owe California income taxes, and others will not. Given that point, the majority has no basis, under Rule 23 or otherwise, to assume the California tax liability of the three named plaintiffs is broadly representative. More importantly, it is California's burden to demonstrate our understanding is untrue in order to justify its discriminatory differentials. It has made no such showing in this case.

Next, while it is true that "[i]f a claim based on the payment of California income taxes had been made in the district court, that claim was required to have been based on law or fact 'common to the class,'" Maj. Op. at 25, that observation affords the majority no help. The law common to the class is the constitutional issue under the Privileges and Immunities Clause, and Rule 23(a)(2), stated in the disjunctive, requires nothing more. In other words, the only common "claim" that is required by Rule 23 to appear in the complaint is the one the plaintiffs advanced—that each class member pays fees higher than those charged to California residents.

[8] The Franchise Tax Board's 2014 Annual Report is the most recent available data.

taxes than others, but like Californians generally, nonresident fishermen contribute meaningfully to the State's coffers collectively. All told, the majority improperly focuses on a few fishermen whose contributions it deems insignificant on the overall tax liability spectrum, but the record reflects, and common sense dictates, nonresident fishermen's taxes contribute materially to conservation expenditures.

## B.

By chalking up to a rounding error the taxes nonresidents pay, the majority effectively shifts the applicable burden. Yet, any purported lack of evidence on the tax liability of nonresident fishermen is a strike against California, not against the plaintiffs. It is California that shoulders the burden to demonstrate that its discrimination "bears a close relation to the achievement of substantial state objectives." *Friedman*, 487 U.S. at 70. Moreover, it is California that must demonstrate its differentials "merely compensate" for expenditures that derive from taxes "which only residents pay." *Toomer*, 334 U.S. at 399. Finally, it is California that must demonstrate it permits nonresident fishermen to do business "on terms of substantial equality" with citizens of the State. *Id.* at 396. Unfortunately, the majority lets California off the hook, for while the State is owed some deference, it made no effort to account for nonresident taxes whatsoever. California simply fails to meet its burden. The upshot is that nonresident fishermen stand on different footing than residents, whether fisherman or not. They alone pay differentials but must also pay the same taxes on income earned within the State.

To illustrate, the 775 nonresident fishermen can be charged for a $641,000 "subsidy," even though they pay state

taxes to cover this conservation expenditure. In-state fishermen, by contrast, receive a $4,700,080 subsidy, but California's 15,000,000 taxpayers collectively foot the bill. Accordingly, using the majority's numbers, California residents, whether fisherman or not, pay about thirty cents on average towards the subsidy to in-state fishermen, whereas nonresident fishermen are charged over $800 each on average for the "subsidy" they receive.[9]

It bears repeating: California shoulders the burden of showing the additional fees charged to nonresidents are closely related to the "taxes which only residents pay," *Toomer*, 334 U.S. at 399, and California must permit nonresident fishermen to do business on terms of substantial equality with citizens of the State. By overlooking how the taxes nonresident fishermen pay the State defray the costs of any subsidy for conservation, California fails to meet its burden. The fee differentials must accordingly be struck down.

---

[9] Notably, *Carlson* rejected the "proposition that the state may subsidize its own residents in the pursuit of their business activities and not similarly situated nonresidents, even though this results in substantial inequality of treatment." 798 P.2d at 1278. The court found such a system "economically indistinguishable from imposing a facially equal tax on residents and nonresidents while making it effectively unequal by a system of credits and exemptions." *Id.* It declined to strike down the differential imposed by Alaska on this basis because state taxes were not "substantially the sole revenue source" for conservation expenditures. *Id.* (noting 86 percent of state revenues derived from petroleum production). The opposite is true here—personal income tax and sales tax made up 86 percent of General Fund revenues for the year ending June 30, 2015. *See* California State Controller's Office, COMPREHENSIVE ANNUAL FINANCIAL REPORT FOR THE FISCAL YEAR ENDED JUNE 30, 2015 42 (2016), *available at* http://www.sco.ca.gov/Files-ARD-Local/LocRep/cafr15web.pdf.

## C.

If left to stand on this showing, we have no reason to think interstate fee differentials will not proliferate. Indeed, California could, for example, charge nonresident truckers and commercial airline pilots fees for earning a living off state-subsidized highways and airports. And why wouldn't states seek to recoup from those professions conservation expenditures aimed at maintaining air quality? As in this case, they need only intend to close a budget gap and need not identify any relationship between the shortfall and nonresident truckers or pilots. Further, they need not determine what burdens nonresidents impose, if any, on the state's air, roads, and other infrastructure. Nor would they need to identify any savings the state would realize if nonresident truckers and pilots were excluded. Finally, they could, like California, ignore nonresident taxes in setting the fee, so long as a few of the truckers or pilots earned incomes that led to modest in-state tax payments. The Privileges and Immunities Clause should preclude such barriers because they disrupt interstate economic harmony unjustifiably. The majority unfortunately holds otherwise, and thereby subverts one of the most important economic compacts that initially bound us together.

## III.

This country is more than a league of confederated states—it is a nation. Yet the enactment of discriminatory fee differentials promotes our economic balkanization. We must be mindful of competing interests when evaluating such measures, but they require ample justification. California's showing in this case does not come close to meeting its

burden, so the fee differentials are illegal under the Privileges and Immunities Clause.  I respectfully dissent.

---

REINHARDT, Circuit Judge, dissenting, in which BERZON, Circuit Judge, joins.

I concur in Part III of Judge M. Smith's dissent and agree that California failed to carry its burden of demonstrating that the differential fees it charges to nonresidents are "closely drawn" to the achievement of a "substantial state objective." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 68 (1988). Permissible state objectives include "compensat[ing] the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay." *Toomer v. Witsell*, 334 U.S. 385, 399 (1948). Here, California does not contend that nonresident fishermen impose any sort of added enforcement burden. Nor does the state provide persuasive evidence that its fee differentials bear a "reasonable relationship" to its legitimate interest in receiving compensation from nonresidents for its "conservation expenditures from taxes which only residents pay." *Toomer*, 334 U.S. at 399 (1948). Therefore, I agree with Judge M. Smith that the state has failed to make the requisite showing to justify *any* differential.  That conclusion does not embrace either of the views expressed by the original panel as to how a differential should be calculated when it is in fact justified. *See Marilley v. Bonham*, 802 F.3d 958, 966–68 (9th Cir. 2015), *reh'g en banc granted*, 815 F.3d 1178 (9th Cir. 2016) (Graber., J., dissenting) (comparing the "per capita" and "fair share" approaches to calculating a justified fee differential).